IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

G.L. WILLIAMS ASSOCIATES, INC.;      :
RT TECHNOLOGY, LLC; and              :
WEST COAST REPS, INC.,               :
                                     :
       Plaintiffs,                 :      C.A. No.
                                     :
    v.                           :      JURY TRIAL DEMANDED
                                     :
MOTOROLA, INC.,                      :
                                     :
       Defendant.                  :

## COMPLAINT

Plaintiffs G.L. Williams Associates, Inc. ("GLW"), RT Technology, LLC ("RTT") and West Coast Reps, Inc. ("WCR") (collectively, the "Plaintiffs"), by and through their undersigned counsel, bring this Complaint against Motorola, Inc. ("Motorola") and allege as follows:

### Introduction

1.    Plaintiffs commence this action against Motorola for compensatory and punitive damages, interest and costs of suit, including attorney's fees, for: (i) breach of contract; (ii) promissory estoppel; (iii) negligent misrepresentation; (iv) breach of the duty of good faith and fair dealing; (v) fraud; and (vi) deceptive trade practices, given Motorola's unlawful and improper conduct in this matter.

### Parties

2.    GLW is a corporation organized and existing under the laws of the State of New Jersey, with its principal place of business located at 805 Hopkins Road, Haddonfield, New Jersey.

3.    RTT is a limited liability company organized and existing under the laws of the State of Maryland, with its principal place of business located at 19012 Raines Drive, Rockville, Maryland.

4.    WCR is a corporation organized and existing under the laws of the State of California, with its principal place of business located at 441 E. Whittier Boulevard, Suite 3A, La Habra, California.

5.    Motorola is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at 1303 East Algonquin Road, Schaumburg, Illinois. Motorola is a citizen of Delaware and Illinois.

**Jurisdiction and Venue**

6.    Subject matter jurisdiction is based upon diversity of citizenship pursuant to 28 U.S.C. § 1332(a)(2), because there is complete diversity of citizenship between Plaintiffs and Defendant, and the amount in controversy as to each Plaintiff exceeds $75,000, exclusive of interest and costs.

7.    This Court has personal jurisdiction over Motorola because it is incorporated in this district and regularly conducts business in this district.

8.    Venue lies in this district pursuant to 28 U.S.C. § 1391(a)(1), (a)(3), and (c) because Defendant is incorporated in and transacts business in this district and is subject to personal jurisdiction in this district. (*See also J-Squared Technologies, Inc. v. Motorola, Inc.*, 2005 WL 388599 (D. Del. Feb. 4, 2005)).

**Facts**

**A.    The Industry and its Players**

9.    Motorola, and specifically its division known as Motorola Computer Group ("MCG"), describes itself as the world's leading provider of embedded computing technology serving original equipment manufacturers, primarily in the telecommunications and military/aerospace industries.

10.    Plaintiffs are leading technology sales organizations, known in their industry as manufacturer's representatives.

11.    As a result of the burst of the dot-com bubble, Motorola, like virtually all of the manufacturers serving technology customers, saw a substantial decrease in revenue beginning in 2001.   As a result of this downturn, Motorola had to re-engineer its business model and significantly downsize its direct sales force.

12.    Between 2000 and 2002, MCG's North American operations laid off approximately two-thirds of its direct sales employees.  Thereafter, it was left with less than ten (10) outside sales employees to cover all of North America.

13.    In an effort to service its present customer base and continue to generate demand creation, Motorola turned to an indirect business model through which it would employ a number of manufacturer's representatives, including Plaintiffs.

**B.    Motorola's Deceptive Negotiations**

14.    Beginning sometime prior to May 2002, Motorola, through its sales and management-level employees, began to approach a number of different manufacturer's representatives to fill the gap created by the layoffs.

15.    All prospective manufacturer's representatives had one common concern that they voiced when approached regarding Motorola's manufacturer's representative business model: whether this new business model was a solution that Motorola held for the long-term such that the manufacturer's representatives' up-front expenditures of capital and labor resources and lost opportunity costs would generate a stream of revenue sufficient to recoup costs and otherwise replace various opportunity costs known to both parties (*e.g.*, termination or non-engagement of competing lines).

3

16.    Plaintiffs did so inquire as to Motorola's intent to establish a long-term relationship with its prospective manufacturer's representatives.

17.    Motorola represented, unequivocally, that it had a long-term strategy to maintain the manufacturer's representatives business model.  Motorola made these representations through a number of employees, including: Paul Holt, Steve Cunha, Larry Terry, Marc Watts, Al Currano, Jim McGregor, Sue Hamlett, Julie Blair, Frank Rafie and Jay Liston.  The substance and timing of the representations are more fully discussed below.

18.    Notwithstanding its representations to the contrary, at no time did Motorola hold a belief or intention that its proposed manufacturer's representative business model would, in fact, be a long-term relationship or solution.

19.    Indeed, by January of 2003, or by at the latest April 2003, internal Motorola correspondence confirmed that the manufacturer's representatives model was not, in fact, a long-term business model or solution.

20.    Despite this internal corporate strategy, Motorola represented to Plaintiffs and other prospective manufacturer's representatives that the manufacturer representatives business model was a long-term sales solution.

**C.     The Agreements**

     **1.     <u>Agreement with West Coast Reps, Inc.</u>**

21.    On or about June 2002, Motorola approached WCR in an attempt to enter into an agreement whereby WCR would act as a manufacturer's representative for Motorola.

22.    Motorola made representations to WCR (including Walter Reynolds, Elmo Pinard and Joe Dohn) that Motorola was engaging manufacturer representatives across North America and that this business model was a long-term solution for Motorola.  Frank Rafie, Jay Liston, Jim McGregor, Julie Blair, and others made these representations.  The discussions with the

4

Motorola employees took place over the telephone and through in-person meetings in June, August, September and November of 2002 and January and February of 2003.

23.    During these initial discussions, WCR was informed that it was required to terminate its existing manufacturer representative agreement with General Micro Systems ("GMS"). GMS was a direct competitor of Motorola.

24.    Pursuant to Motorola's instructions and based upon Motorola's representations that it maintained a long-term solution to employ its manufacturer's representatives, WCR cancelled its agreement with GMS on or about September 15, 2002. WCR was forced to terminate its relationship with GMS six months prior to Motorola's execution of the WCR Agreement. As a result of this termination, WCR was forced to forfeit approximately $20,000 in GMS commissions already earned.

25.    In February 2003, WCR and Motorola negotiated the accounts to be included as part of the corpus to which WCR would receive commissions. On or about February 3, 2003, Jim McGregor of Motorola agreed to incorporate a number of accounts into the Agreement.

26.    Based on the representations that the manufacturer's representative business model was Motorola's long-term business solution, WCR executed the Agreement with Motorola on February 24, 2003. WCR expended approximately $62,000 to implement its new manufacturer representative commitments during the first eleven months under the Agreement. Moreover, as a result of canceling the agreement with GMS, WCR lost approximately $20,000 in commissions already earned.

27.    It was later determined that Motorola did not have the present intent to perform its stated representations to establish and maintain a long-term manufacturer's representatives business model.

5

28.    On March 5, 2003, Walt Reynolds of WCR initialed an exhibit to the Agreement that he believed encompassed the complete list of accounts agreed to be a part of the Agreement on February 3, 2003.  Unbeknownst to Mr. Reynolds, the exhibit did not include all the accounts to be included in the Agreement.

29.    On March 18, 2003, Motorola countersigned the WCR Agreement. (WCR Agreement attached as Exhibit A).

30.    As part of its obligations under the Agreement, WCR disclosed certain confidential and proprietary information to Motorola in furtherance of the joint undertaking. This confidential information included: (i) customer lists; (ii) WCR's customers' contact information and purchase history; and (iii) potential customer contacts within the territory covered by the Agreement, including Hawaii and Nevada.

31.    During the initial year of the Agreement, Motorola failed to pay commissions that were properly payable to WCR.  Upon information and belief, Motorola is believed to have underpaid WCR by forty percent (40%) or more on sales that were made in WCR's territory during the first year of the relationship.

32.    Motorola also failed to pay WCR commissions owed for the accounts that were to be made part of the WCR territory as agreed-to by Motorola through Jim McGregor.

33.    On February 26, 2004, Motorola delivered a letter to WCR stating that it believed the contractual relationship between it and WCR was to expire on March 17, 2004.  (Attached as Exhibit B).

34.    From its inception until the date Motorola alleged the Agreement was to expire, WCR fully performed its obligations under the Agreement.

35.    Motorola failed to pay WCR the 180 days of trailing commissions it was entitled to under the Agreement.

6

## 2. Agreement with RT Technology, LLC

36. Beginning in July 2002, Motorola began discussions with Joe Palermino about becoming a manufacturer's representative for Motorola, primarily focusing on the military and aerospace accounts in and around Washington, D.C.

37. At the initial stages of negotiating the Agreement, Joe Palermino was working with DSPCon, Inc., through its unincorporated division, RT Technologies.

38. In April and May 2003, Al Currano, Jeanne Kolasa and Paul Holt presented that the manufacturer's representative business model was a long-term solution for Motorola.

39. During the negotiations leading up to the execution of the RTT Agreement, Al Currano instructed Joe Palermino that he was required to hire one additional full-time employee upon execution of the Agreement and an additional full-time employee by the first-year anniversary of the Agreement. This requirement would triple RTT's employees from one to three. These representations were later confirmed and followed-up on by Jeanne Kolasa in the second half of 2003.

40. It was later determined that Motorola did not have the present intent to perform its stated representations to establish and maintain a long-term manufacturer's representatives business model.

41. Based on these representations, DSPCon, for its unincorporated division RT Technologies, executed the Agreement on or about May 9, 2003. RTT and Joe Palermino expended approximately $80,000 to implement its new manufacturer representative commitments for Motorola during the first eight months under the Agreement. Moreover, Joe Palermino terminated his formal relationship with DCPCon and began working exclusively with RTT.

42.    Motorola, specifically, Al Currano, knew that that Agreement was to be performed by Joe Palermino of RTT. Indeed, the Agreement contained an identification of RTT and Joe Palermino as the individual for formal notice under the Agreement and commission payments accomplished through wire transfers identified RTT.

43.    Motorola, through its new General Manager Wendy Vittori, countersigned the Agreement on May 15, 2003. (RTT Agreement attached as Exhibit C).

44.    As part of its obligations under the Agreement, RTT disclosed certain confidential and proprietary information to Motorola in furtherance of the joint undertaking. This confidential information included: (i) customer lists and (ii) RTT's customers' contact information and their purchase history.

45.    On February 26, 2004, Motorola improperly terminated the RTT Agreement under the Agreement's performance standards and non-assignment provisions.  (Attached as Exhibit D).

46.    As a result of the improper termination of the RTT Agreement, RTT was compelled to terminate the employment of the full-time employee it was required to hire pursuant to the terms of the Agreement.

47.    From its inception until the date Motorola alleged the Agreement was terminated, RTT fully performed its obligations under the Agreement.

48.    Motorola failed to pay RTT the 180 days of trailing commissions it was entitled to under the Agreement.

### 3.    Agreement with G.L. Williams Associates, Inc.

49.    Beginning in October of 2002, Motorola approached GLW (Scott Williams and Mark Gernhardt) in an effort to entice it to become a manufacturer's representative. After six months of discussions, GLW initially had turned down Motorola because it had a manufacturer's

representative agreement with SBS Technologies ("SBS"), a company that directly competed with Motorola.

50.     Under the agreement with SBS, GLW earned over $200,000 per year in commissions. GLW relayed this fact to Motorola as an explanation for not wanting to move forward with the negotiation process.

51.     Motorola again returned in May of 2003 and attempted to convince GLW to become its manufacturer's representative. Steve Cunha personally visited the GLW main office to reassure GLW of Motorola's long-term intentions. Steve initiated a conference call with Paul Holt, Director of North American Sales, to reiterate that Motorola was committed to a long-term relationship with manufacturer's representatives and to assure GLW that signing on with Motorola would not be a risk relative to realized revenue for GLW. Motorola clearly represented that their existing commissions were commensurate with current SBS commissions of approximately $200,000. These representations were made in April and May 2003 through in person meetings, email correspondence and telephone calls.

52.     Based on these representations, GLW executed the Agreement on or about May 29, 2003. Motorola, through its new General Manager, Wendy Vittori, countersigned the Agreement on June 3, 2003. (GLW Agreement attached as Exhibit E).

53.     GLW expended approximately $150,000 to implement its new manufacturer representative commitments during the first seven months under the Agreement. The two principle sales engineers at GLW spent 75-80% of their time supporting Motorola sales efforts in an attempt to recover from the loss of revenue from SBS.

54.     It was later determined that Motorola did not have the present intent to perform its stated representations to establish and maintain a long-term manufacturer's representatives business model. Within three months of terminating SBS, GLW realized that Motorola's total

9

sales in the GLW territory were less than one-quarter that of SBS. Moreover, it became apparent that Motorola was not treating the manufacturer's representative business model as a long-term solution.

55.    As part of its obligations under the Agreement, GLW disclosed certain confidential and proprietary information to Motorola in furtherance of the joint undertaking. This confidential information included: (i) customer lists and (ii) GLW's customers' contact information and their purchase history and (iii) key program and territory knowledge.

56.    On February 26, 2004, Motorola terminated the GLW Agreement for non-performance of certain obligations. (Attached as Exhibit F).

57.    GLW was only paid $65,000 in commissions under the terms of the Agreement, as construed by Motorola.

58.    At the time of termination, Motorola did not specifically identify the exact nature of the non-performance nor did it permit GLW to cure any alleged non-performance within the 30-day contractual right to cure period.

59.    From its inception until the date Motorola alleged the Agreement was terminated due to non-performance, GLW substantially performed all obligations under the Agreement as it exceeded the total, cumulative sales figures.

60.    Moreover, Motorola failed to pay GLW 180 days of trailing commissions.

**D.    Motorola's Bad Faith Dealings with the Manufacturer's Representatives**

61.    Shortly after Motorola began its endeavors to sign-up manufacturer's representatives, the MCG General Manager, Rob Shaddock, left his post with the company. Denis McCarthy was appointed as acting General Manager until a permanent replacement was found.

10

62.     Immediately under Denis McCarthy was Kevin Parslow, the Director of Worldwide Sales.

63.     Upon taking his position, Kevin Parslow assumed the responsibility of putting the manufacturer's representatives in place.

64.     Paul Holt was the Director of North American Sales and reported to Kevin Parslow.

65.     Holt was responsible for working with the few business development managers (including McGregor, Currano and Cunha) that remained with the company to identify and develop relationships with potential manufacturer's representatives.

66.     Holt, assisted by Larry Terry and others, meet with and signed an agreement with J-Squared Technologies, Inc. ("JST") in December 2002 for JST to serve as Motorola's representative in Canada.   The same representations concerning the manufacturer's representatives business model being a long-term solution for Motorola were also related to JST (in September through December 2002 and again in March 2004).

67.     As late as January 2003, Parslow began to formalize performance metrics for all subsequent agreements where once there were none.  This maneuver was undertaken to permit Motorola a 30-day exit strategy whenever it deemed the time was right to revert to a direct sales model.

68.     As late as April 2003, Parslow issued a directive that there was to be a moratorium placed on the execution of all additional manufacturer's representative agreements.

69.     Motorola failed to disclose this information to Plaintiffs when negotiating the Agreements and/or after the Agreements were executed.  Plaintiffs clearly expressed concern about the long-term relationship with Motorola.  Motorola eased these concerns by indicating that they had established an infrastructure to support the manufacturer's representative sales

11

channel. Motorola indicated that this infrastructure would not be in place if the relationship was intended to be short term.

70.     In spite of the Motorola's intent to maintain the manufacturer's representative business model only as a stop-gap measure and not as a long-term solution in the marketplace, it nonetheless continued to negotiate and execute agreements with representatives based upon the premise that this business model was a long-term solution.

71.     The rigors of demand fulfillment and aspirations of further demand creation of Motorola products in the marketplace necessitated that Motorola maintain the appearance that the manufacturer's representative business model was and continued to be the business model of the future.

72.     Motorola made a presentation during a "kick-off" event for its manufacturer's representative in Boston, in September 2003. At this presentation, Steve Machernis, Paul Holt and others represented to Plaintiffs that Motorola was continuing to develop the manufacturer's representative business model as a long-term solution and framework for the future. These representations proved to be false when made or were proffered without the present intent to perform.

73.     Had the information concerning the moratorium and intent not to perform in the future had been disclosed, Plaintiff would not have executed the Agreements, they would not have disclosed their confidential and proprietary information to Motorola nor would they have dropped competitors' lines, agreed to refrain from working on competitors' lines or incurred the expenses to develop the Motorola line.

\*     \*     \*

12

**Causes of Action**

Count I – Breach of Contract

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

74.     Plaintiffs performed all of their obligations under their respective Agreements.

75.     Motorola breached the Agreements with Plaintiffs by, *inter alia*:

(i)     failing to disclose that a moratorium was placed on the execution of all further manufacturer's representative agreements;

(ii)    misappropriating Plaintiffs' confidential information to their detriment;

(iii)   failing to pay all commissions properly payable under the Agreements;

(iv)    failing to identify the basis for terminations for cause and otherwise frustrating the manufacturer's representative contractual right to cure; and

(v)     undertaking conduct that constitutes a willful, wanton and malicious breach of contract through the manufacture of for-cause terminations of the RTT and GLW Agreements when there was not basis for such termination.

76.     By reason of Motorola's breaches and failures to perform under the Agreements, Plaintiffs have been damaged in an amount to be determined at trial.


Count II – Promissory Estoppel

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

77.     As more fully detailed above, Motorola made numerous representations and promises concerning its intent to develop and maintain the manufacturer's representatives business model as a long-term solution.

78.    Motorola knew or reasonably should have known that its representations and promises to formulate a long-term solution with the manufacturer's representatives would induce the representatives to expend time, energy and funds to build an infrastructure and fixed costs to perform their obligations under the Agreements.

79.    As more fully detailed above, Plaintiffs were induced by Motorola's representations and promises of its intent to sell its products through the manufacturer's representatives business model and expended substantial time, energy and funds to build an infrastructure and fixed costs to perform their obligations under the Agreements.

80.    Motorola directly benefited from Plaintiffs' reliance on Motorola's promises. Injustice can only be avoided by the enforcement of Motorola's promises to Plaintiffs.

81.    By reason of Motorola's failures to perform under the Agreements, Plaintiffs have been damaged in an amount to be determined at trial.

<u>Count III – Negligent Misrepresentation</u>

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

82.    In negotiating the manufacturer's representative agreements, Motorola negligently and without the use of reasonable care communicated materially false statements to Plaintiffs and/or did not possess the present intent to perform its obligations when the representations were made.

83.    Plaintiffs reasonably relied on the accuracy of Motorola's materially false statements in conducting its business and as a result of that reliance expended substantial capital to position themselves to sell Motorola's products.

14

84.    By reason of Motorola's misrepresentations, Plaintiffs have been damaged in an amount to be determined at trial.

### Count IV – Breach of the Duty of Good Faith and Fair Dealing

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

85.    Under applicable law, Motorola owed duties of good faith and fair dealing to Plaintiffs. These duties arise out of the agreement entered into between these parties and/or the special relationship existing between the parties.

86.    Motorola breached its duties of good faith and fair dealing by: (i) failing to disclose that it had placed a moratorium on the execution of all additional manufacturer's representative agreements in April 2003; (ii) fabricating facts surrounding the termination of the GLW and RTT Agreements; (iii) permitting select distributors with registered programs to obtain preferential pricing terms that tended to artificially depress Plaintiffs' commissions; and (iv) misrepresenting its present and/or future intent to develop and maintain manufacturer's representatives as a long-term business model to sell its products.

87.    Motorola's bad-faith actions were beyond the risks assumed by Plaintiffs when they entered into the agreements.

88.    By reason of Motorola's conduct in this matter, Plaintiffs have been damaged in an amount to be determined at trial.

### Count V – Fraud

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

15

89.    As described above, Motorola (through its various employees, including, Terry, Cunha, Holt, McGregor, Machernis, Currano and others) made false representations of fact to as its present intention to maintain manufacturer's representatives as a long-term business model to sell its products.

90.    Motorola knew these representations to be false when they were made or permitted the representations to be made with reckless indifference to the truth.

91.    Motorola's fraudulent representations were willful, wanton and/or malicious.

92.    Motorola proffered these representations with the intent Plaintiffs would execute the agreements and maintain demand fulfillment, develop demand creation and service Motorola's current customer base until such time as the business cycle would permit Motorola to revert back to its direct sales force.

93.    Plaintiffs executed the agreements, expended time and resources and even lost various other opportunities based upon Motorola's representations.

94.    By reason of Motorola's fraudulent conduct in this matter, Plaintiffs have been damaged in an amount to be determined at trial.

Count VI – Deceptive Trade Practices (under all applicable state law)

Plaintiffs repeat and reallege each allegation contained above as though fully set forth herein.

95.    Under all potentially applicable law (including Arizona, California, Maryland and New Jersey), Motorola had a statutory duty to refrain from engaging in deceptive trade practices with its manufacturer's representatives.

96.    Through the conduct described above, Motorola engaged in a pattern and practice of deceit.

97.    By reason of Motorola's unlawful conduct in this matter, Plaintiffs have been damaged in an amount to be determined at trial, including all statutory damages.

WHEREFORE, Plaintiffs demand judgment against Motorola as follows:

A.    an award of nominal, compensatory, and/or restitution damages in an amount to be determined at trial,

B.    an award of punitive damages, statutory and/or other exemplary damages in an amount to punish and deter similar fraudulent and deceptive conduct in the future;

C.    an award of both pre- and post-judgment interest at the legal rate;

D.    an award of the costs and disbursements of this action, including reasonable counsel, accountants' and experts' fees, costs and expenses; and

E.    all such other and further relief as the Court deems just and proper under the circumstances.

Dated: February 22, 2006

Sean J. Bellew (#4072)
David A. Felice (#4090)
Cozen O'Connor
1201 North Market Street, Suite 1400
Wilmington, DE  19801
Telephone:  (302) 295-2000
Facsimile:  (302) 295-2013
    *Attorneys for Plaintiffs*

Of Counsel:
Kevin F. Berry
Cozen O'Connor
1900 Market Street
Philadelphia, PA  19103
Telephone:  (215) 665-2000
Facsimile:  (215) 665-2013

# EXHIBIT A

# MANUFACTURER'S REPRESENTATIVE AGREEMENT

### between

## MOTOROLA COMPUTER GROUP

### and

## WEST COAST REPS, INC.

1

# TABLE OF CONTENTS

Article I. Definitions ...........................................................................................................3

Article II. Appointment and Scope ......................................................................................3

Article III. Representative's Compensation ..........................................................................5

Article IV. Representative Obligations .................................................................................7

Article V. Motorola Obligations .......................................................................................10

Article VI Confidentiality and Proprietary Rights ............................................................10

Article VII. Term and Termination ...................................................................................11

Article VIII. Dispute Resolution .......................................................................................13

Article IX. General Provisions ..........................................................................................13

**LIST OF EXHIBITS**

- **EXHIBIT 1: REPRESENTATIVE PRODUCT LIST/COMMISION RATES**
- **EXHIBIT 2: TERRITORY AND HOUSE ACCOUNT LIST**



THIS AGREEMENT is made and effective on the date of the last signature below by and between Motorola Inc., a Delaware corporation, by and through its Computer Group having an office at 2900 South Diablo Way, Tempe Arizona, United States of America ("Motorola"), and West Coast Reps, Inc., a Corporation organized under the laws of, and having an office address of 441 E. Whittier Blvd., Suite 3A,, La Habra, CA 90631 ("Representative").

# Article I. Definitions

1.1   **Agreement.** "Agreement" means this document and any exhibit, attachment, schedule, addendum, or modification unless the context otherwise indicates.

1.2   **Customer.** "Customer(s)" means any purchaser of Products from Motorola for end use in the Territory.

1.3   **Products.** "Products" means those Motorola products and systems that are specifically identified at Exhibit 1.

1.4   **Confidential Information.** "Confidential Information" means all information which is disclosed in oral, written, graphic, machine recognizable, and/or sample form, and which is clearly designated, labeled or marked as confidential or its equivalent and includes all know-how, designs, drawings, specifications, catalogs, data sheets, sales and technical bulletins, service manuals, mechanical diagrams, and all other information relating to the design, manufacture, use, and service of the Products, including any other information relating to Motorola's business that may be sent to Representative during performance of this Agreement and that is not generally known in the trade.

1.5   **Territory.** "Territory" is limited to the area or specified accounts identified in Exhibit 2.

# Article II. Appointment and Scope

2.1   **Appointment.** Subject to the terms, conditions and duration of this Agreement, Motorola appoints Representative as a non-exclusive, independent manufacturer's representative of the Products for end use in the Territory at such prices and upon such terms and conditions as established by Motorola. Representative accepts this appointment and agrees to devote such time and attention to the performance of such duties as may be reasonably necessary. Representative shall not, without Motorola's written authorization, register as Motorola's representative in any country or jurisdiction other than Territory.

2.2   **Territory Exclusivity.** This appointment is non-exclusive. While it is not currently Motorola's intent, Motorola retains the right to appoint additional sales representatives, agents, distributors or other representative for Products in or for the Territory. Motorola may also at any time sell any Products directly, as identified in Exhibit 1 or by written notice as provided for in paragraph 3.1, or indirectly through any Motorola subsidiary or affiliate without incurring any commission or other payment obligation to Representative of any type or nature. Motorola specifically reserves the House Accounts listed in Exhibit 2 as Motorola direct accounts for which Representative will not be entitled to receive any commission, including cases where a House Account places an order through Motorola's distributors.

3

**2.3    Distribution Outside Territory.** Representative will limit its Product sales activities to Customers within the Territory and will not market Products outside the Territory.

**2.4    Agents and Subrepresentatives.** Representative may not appoint any agent, subrepresentative, or other person ("Sub-Agent") to promote Product sales or to otherwise perform any of Representative's obligations without Motorola's prior written approval and compliance with Motorola's policy for obtaining such approval. Motorola's approval of any such Sub-Agent shall be based upon Motorola's review of information provided by Representative. Any such approval shall not be deemed to create any obligation between Motorola and Sub-Agent. Actions of Sub-Agents shall be the sole responsibility of Representative and Representative agrees to indemnify and hold Motorola harmless against any and all acts, whether unintentional or deliberate, on the part of the Sub-Agent. Prior to furnishing any Product to a Sub-Agent, Representative shall obtain a signed agreement from such Sub-Agent consistent with the terms of this Agreement and shall, among other things, require that the Sub-Agent comply with the United States Foreign Corrupt Practices Act and Motorola's Code of Business Conduct. Sub-Agents will in no event be allowed to describe themselves or advertise themselves as Motorola authorized representatives or distributors.

**2.5    Independent Contractor Status.** Representative is an independent contractor who will not be considered a Motorola employee, agent or legal representative for any purpose; neither Representative nor any of its directors, officers, employees or agents will be, or will be considered, a Motorola agent or employee. Representative is not granted and will not exercise any right or authority to assume or create any obligation or responsibility on behalf of, or in the name of, Motorola. Specifically, Representative does not have authority, on Motorola's behalf, to: a) contract or make commitments; b) change prices or terms and conditions of sales; c) make warranties, oral or written, express or implied concerning Products; or d) take any action which would result in Motorola's liability for state, federal, or local taxes or any expenses of any kind.

**2.6    Operations and Expenses.** Representative's detailed operations under this Agreement are subject to the sole control and management of Representative. Except for training as may be provided by Motorola under Section 5.5, Representative is responsible for all its own expenses and employees and for providing, at its own expense, such office space, facilities, and training as may be required to carry out its obligations under this Agreement. Representative will incur no expense chargeable to Motorola, except as specifically authorized in advance in writing by Motorola. Any such chargeable expense shall be documented in accordance and consistent with applicable Motorola policies.

**2.7    Noncompetition.** Representative will not sell, offer for sale, or act as sales agent for the solicitation of orders for any products that are competitive with any of the Products as defined by Motorola; nor will Representative engage in any activity that may result in a relationship with current or future customers that creates a conflict of interest as defined by Motorola.



# Article III. Representative's Compensation

3.1    **Commissions**. For services detailed in this Agreement, commissions will based upon the Net Sales Price of Product for those orders to Motorola from either Motorola's distributors or those direct Customers that are in the Territory, other than Motorola House Accounts. Eligible orders shall be limited to those received by Motorola after the effective date of this Agreement and registered through the Motorola registration system, whether registered by Motorola's distributor for indirect orders or new orders registered by Representative, through its Motorola contact, for direct orders. Net Sales Price is defined as the:

(1) actual price (i.e., original contract price adjusted by change orders and termination orders) paid to Motorola by Customers for direct orders less any discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any; or

(2) Motorola list price less the then current Motorola distributor discount for indirect orders less any additional discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any.

The commission rate is identified for each Product in Exhibit 1. This agreed to commission rate is subject to subsequent reduction should business circumstances dictate or as may be restricted by law, regulation or contract with the Customer.

Motorola may make adjustments to authorized Territory and direct accounts upon written notice to Representative. In such cases of adjusted Territory and/or direct accounts, Representative will be eligible for a commission, pursuant to the commission schedule included in Exhibit 1, on all orders accepted and shipped within a period of 120 days following the date of adjustment for orders effected by those Territory and direct accounts changes.

3.2    **Net Sales Price Changes**. If: (a) the Net Sales Price changes after acceptance of the order by Motorola; or (b) credit is granted or a refund is made to a Customer for returned Products, and such change, credit or refund results in a different commission from the commission derived from Paragraph 3.1 above, any over or underpayment will be: (i) subtracted from or added to the next commission payment payable to Representative; or (ii) refunded by or paid to Representative within 30 days of written notice by Motorola if no further commissions are to become due.

3.3    **Billing Documents**. Any and all billing documentation which Motorola may provide to its Customers will be in accordance with Motorola's standard invoicing techniques reflecting the actual terms and conditions (prices, terms, commissions, etc.) of the sales transaction. Under no circumstances will a Customer be invoiced at other than the actual sales price.

3.4.    **Payments**. Commissions are earned on orders when payments of the invoices have been received from Customers, or on behalf of Customers, whether such payments are in

5

Rev. Date January 2003

whole or in part and shall be payable in accordance with Motorola standard policy of payment to third party representatives. Where payment is less than the full amount due on an invoice, the commission earned will be limited to the applicable commission rate multiplied by the amount actually received. Commissions earned may be subject to delay based upon milestone payments to Motorola, payment holdbacks and performance bond requirements and which delay shall be agreed to in writing by the parties prior to final customer contract award. Commissions earned will accumulate monthly and be due and payable on the end of the month following the month in which Customer payments have been received Commissions will be made payable to Representative and transmitted by mail to Representative's business address or such other means as are permissible under the laws of the Territory and the United States of America and in accordance with the internal policies of Motorola. Representative represents and warrants that it will report and disclose all commissions, fees or other types of compensation received under this Agreement as required under law.

3.5    **Refusal to Accept Orders.** Representative's entitlement to a commission depends on Motorola's acceptance of Customer orders during the term of this Agreement and Representative's efforts to secure such orders. Motorola's failure or refusal to accept any order for any reason shall not create an obligation to pay either a commission or any damages in lieu thereof, nor shall any delay or default in the performance of any accepted order create an obligation to pay a commission or any claimed damages. Motorola shall not be obligated to make any commission payments for any orders received or accepted before the effective date of this Agreement, for sales from one government to another government, or for any order which is not, in Motorola's opinion, the result of Representative's efforts consistent with the terms and conditions of this Agreement.

3.6    **Commission Changes.** Commission levels may be amended by Motorola from time to time on all future business opportunities and will be effective 180 Days after written notice to Representative.

3.7    **Commission Restrictions.** MOTOROLA WILL NOT PAY A COMMISSION WHERE PROHIBITED OR TO THE EXTENT LIMITED BY UNITED STATES OR LOCAL LAW OR REGULATION, OR BY ANY CONTRACTUAL, FINANCING, OR OTHER SIMILAR PROVISION. REPRESENTATIVE ASSUMES THE RISK THAT A COMMISSION MIGHT BE SUBJECT TO A PROHIBITION OR LIMIT AND THAT REPRESENTATIVE WILL NOT BE PAID AS A RESULT. REPRESENTATIVE IS ENCOURAGED TO REVIEW LOCAL LAW, LOCAL REGULATIONS, POTENTIAL CONTRACTS, AND FINANCING ARRANGEMENTS FOR PROHIBITIONS OR LIMITATIONS ON COMMISSIONS. IF PAYMENT OF A COMMISSION IS LIMITED, BUT NOT ENTIRELY PROHIBITED, BY APPLICABLE UNITED STATES OR LOCAL LAW OR REGULATION, CONTRACT OR FINANCING ARRANGEMENTS, MOTOROLA AND REPRESENTATIVE MAY NEGOTIATE PAYMENT OF COMMISSION ON A CASE-BY-CASE BASIS WITHOUT OBLIGATING MOTOROLA TO PAY A COMMISSION IN EXCESS OF SUCH LIMITATIONS EXCEPT TO THE EXTENT IT AGREES IN ADVANCE AND IN WRITING.

Commissions on the sale of products pursuant to Foreign Military Sales/Foreign Military Financing (FMS/FMF), NATO and other sales where commissions may be otherwise

restricted shall be payable in accordance with the relevant local law and United States law and regulations as follows:

1) Where there is no restriction on commissions, a commission will be paid at the agreed to rate as defined in Paragraph 3.1.

2) Where commissions are restricted, Motorola will pay a commission at the agreed to rate, not to exceed the amount restricted by law or regulation, or as otherwise specifically stipulated to by the Customer in writing prior to contract award.

3) Where a commission is prohibited, Motorola will pay no commission.

3.8   **Limitation of Liability.**  IN NO EVENT, WHETHER FOR BREACH OF CONTRACT, WARRANTY, MOTOROLA'S NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE WILL MOTOROLA BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, LOSS OF PROFITS, LOSS OF DATA, COST OF CAPITAL, COST OF SUBSTITUTION OF PRODUCTS, FACILITIES OR SERVICES, DOWNTIME, COSTS, OR ANY SIMILAR CLAIM OF A SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE NATURE WHATSOEVER TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

3.9   **Claims Procedures.**  Any dispute or claim against Motorola related to this Agreement, or its expiration or termination, requires written notice to Motorola within one hundred eighty (180) days of the event giving rise to the claim.  Failure to give such notice will constitute a waiver of any claim against Motorola and will relieve Motorola from any and all liability on any such claim.

3.10   **Offsets.**  Any credits, allowances, or other amounts payable or creditable to Representative by Motorola will be subject to offset for any claims or other amounts owed by Representative to Motorola pursuant to the provisions of this Agreement or otherwise.

3.11   **Taxes.**  All taxes (including, but not limited to, income, withholding, sales, use, registration, ad valorem, excise, employment and documentary taxes), duties, excises or other such charges imposed by governmental or quasi-governmental bodies relating to the sale, shipment, acquisition, holding and disposition of Products by Representative or Representative's actions or presence in the Territory or any performance under this Agreement that are not the responsibility of the Customer will be paid by Representative, which agrees to indemnify and hold harmless Motorola or any Motorola Affiliate with respect to any such charges paid by Motorola or any Motorola Affiliate.

# Article IV. Representative Obligations

4.1   **Sales Promotion.**  Representative will use best efforts to promote the sale and use of Products in Territory. Representative will immediately submit to its contact within Motorola all leads, forecasts, purchase orders, and other communications Representative develops or receives from a Customer or prospective Customer for the Products.

7

Rev. Date January 2003

Representative must register all sales efforts and leads through the Motorola registration system for those opportunities that may result in direct orders to Motorola and will be eligible for a commission on only those direct orders so registered. Motorola will direct Representative as to the method of adequate registration.

4.2    **Facilities and Personnel.** Representative will maintain, at its own expense, such office space and facilities, and hire and train such personnel, as may be required to carry out its obligations under this Agreement.

4.3    **Promotional Materials.** Representative will maintain an adequate inventory of Motorola's current sales material and samples for use in an efficient and effective manner to promote the sale of Products in the Territory. At Motorola's request, Representative will not use any non-Motorola advertising or promotional materials to promote the Products without Motorola's prior written approval.

4.4    **Performance Standards.** Representative agrees to maintain minimum performance standards as provided in Exhibit 4, which standards may be amended from time to time by written consent of both parties. If Representative fails to meet such minimum performance standards, Motorola may terminate this Agreement for cause in accordance with Paragraph 7.2A.

4.5    **Sales Policies.** Representative will comply, and will cause its employees and agents to comply, with all Motorola sales policies and the Motorola Code of Ethics and Business Conduct and the United States Foreign Corrupt Practices Act.

4.6    **Service and Training.** Representative will assist Motorola in arranging for warranty, maintenance, and repair service for all Customers. Representative will ensure that appropriate personnel attend any local or regional training as Motorola reasonably requires.

4.7    **Local Law.** Representative will notify Motorola of the existence and content of any mandatory provision of law in the Territory or any other applicable law that conflicts with or otherwise affects any provision of this Agreement at the time of its execution or thereafter. Representative agrees to comply with all laws and regulations of the Territory. Failure to comply with this Paragraph 4.7 will be considered a material breach of this Agreement, allowing Motorola to terminate this Agreement effective immediately upon notice to Representative under Paragraph 7. 2E hereof.

4.8    **Questionable Payments.** Representative and Motorola shall use only ethical and legitimate business practices in the activities contemplated by this Agreement. Neither party shall engage in any improper gifts or payments in connection with the marketing or sale of any Product under this Agreement nor engage in any other improper, illegal or unethical conduct. In addition, Representative agrees to cooperate fully with Motorola in any investigation of such matters. As used in this paragraph, the term unethical conduct shall include improper, illegal or unethical conduct and corrupt payments within the meaning of the Motorola Code of Business Conduct, the United States Foreign Corrupt Practices Act (15 United States Code Section 78dd-1 and -2) and local anti-corruption laws. Representative certifies that neither it, nor any of its directors, officers, employees, or agents is an official, agent, or employee of any government or governmental agency or political party or a candidate for any political office as of the effective date of this Agreement.

Representative represents and warrants that all information provided to Motorola during the process of qualification of Representative, is true, accurate and correct and that Representative will promptly notify Motorola of any change to that information or of any event that would or may result in an exception to the representations contained in this Agreement. Representative will require each of its directors, officers, employees, and agents to comply with the provisions of this Paragraph 4.8, and it will ensure that appropriate personnel attend any regional Motorola briefings on this topic. Motorola will make available to Representative the Motorola Code of Business Conduct and any other information requested under this Paragraph 4.8. Notwithstanding any provision of this Agreement, any breach of the provisions of this Paragraph 4.8 will be considered a material breach of this Agreement and entitle Motorola to terminate this Agreement effective immediately on notice to Representative under Paragraph 7.2E and may result in Representative's surrender of any claim for payment under this Agreement and the refund any payment received. Representative shall certify to the representations and warranties contained in this Paragraph 4.8 by reading and executing Exhibit 3 prior to the execution of this Agreement.

4.9    **Indemnification**. Representative agrees to indemnify, defend and save Motorola harmless from and against all claims, proceedings, losses, penalties, damages or actions, and all expenses incidental to any investigation, negotiation or defense thereof, based upon, arising out of, or in connection with: a) damage or injury (including death) to persons, property, reputation, or business opportunity, caused by or sustained in connection with the performance of services hereunder or by conditions created hereby, except for damage or injury resulting solely and directly from Motorola's negligence or willful misconduct; b) breach of any of the provisions of this Agreement; c) negligence or other tortious conduct; d) representations or statements not specifically authorized by Motorola in this Agreement or in writing; e) violation by Representative (or any of its directors, officers, employees or agents) of any applicable law, regulation, or order in the Territory or of the United States; or f) any material misrepresentation or omission made by Representative in connection with the information supplied relative to paragraph 4.12.

Motorola will indemnify and hold Representative, its officers, directors, employees, successors, and assigns harmless against all claims and losses, that may be sustained as a result of: a) breach of any of the material provisions of this Agreement; b) disputes between Motorola and its customers to the extent that such dispute is due solely to Motorola's negligence or non-performance; or c) any material misrepresentation or omission made by Motorola in connection with the Products.

4.10    **Insurance.** Both parties agree to maintain adequate financial resources or insurance to fulfill their financial responsibilities under this Agreement.

4.11    **Security.** If, during this Agreement, Representative is involved in negotiations with sovereign governments or agencies for sale or use of Motorola Products by such governments or agencies requiring security clearance of Representative's personnel, Representative agrees to cooperate fully, to undertake at Representative's expense to acquire the necessary security clearance as requested by the governments or agencies and to observe all regulations or instructions issued by such governments or agencies with respect to such security clearance and maintenance of security.

WCR Rep Agmt2-19

Rev. Date January 2003

4.12    **Due Diligence Review**. Representative, prior to initial appointment as a representative hereunder and any subsequent renewals, shall provide information to Motorola in order for Motorola to perform a due diligence review to assess Representative's ability to perform its obligations under this Agreement. Representative represents and warrants and will, at the time of submission, certify that all information supplied in accordance with Motorola's request is complete and accurate and that Representative will immediate notify Motorola of any and all changes to that information.

## Article V. Motorola Obligations

5.1    **Sales Support**. Motorola will provide Representative English language sales and marketing information for Products and furnish at reasonable cost such catalogs, specifications, promotional literature, and other materials pertaining to Products as are available.

5.2    **Advertising Programs**. Motorola may advertise in the Territory, with or without consultation with Representative.

5.3    **Notification of Changes**. Motorola will advise Representative, either in writing or by electronic means, of any changes in or affecting the Products or prices, terms and conditions of sale, sales policies, projected delivery dates, schedule changes, and other matters that Motorola determines may affect the business of Representative.

5.4    **Assistance**. Motorola will provide Representative reasonable access to and assistance of its technical, sales, and service personnel as Motorola deems appropriate. Such assistance will be without charge to Representative except as otherwise mutually agreed.

5.5    **Training**. Motorola will conduct, and Representative will cause its personnel to attend, such technical and sales training sessions for Products as Motorola deems necessary to allow Representative to effectively market the Products. Such training will be provided without charge to Representative. All compensation, transportation, or living expenses of Representative's personnel while in attendance at such training sessions will be borne by Representative.

## Article VI Confidentiality and Proprietary Rights

6.1    **Confidential Information**. Both parties acknowledge that Confidential Information is valuable and proprietary. The receiving party will hold Confidential Information in strict confidence for five (5) years after expiration or termination of this Agreement and will not disclose it to any other person, firm, or corporation without the disclosing party's prior written approval. This obligation will not extend to information which is now available or becomes available to the public without breach of this Agreement, is released in writing by disclosing party, is lawfully obtained from a third party or parties without confidential obligation, is known to the receiving party prior to such disclosure or is at any time developed by the receiving party independently of any such disclosure or disclosures from the disclosing party.

6.2    **Use of Confidential Information.**  The receiving party will limit its use of Confidential Information and any patent, trademark, or other intellectual property rights of the other party to implementation of this Agreement.  Representative shall place the following legend on all Motorola Confidential Information disclosed by Representative to its government customers:

"The information contained in this document is submitted in confidence, is privileged and exempt from disclosure under the "Freedom of Information Act" (5 U.S.C. Section 552) by reason of exemptions in Sections (b)(3) by reference to 18 U.S.C. Section 1905 - and (b)(4) of said act."

Both parties acknowledge that damages sustained as a consequence of any breach of the other party's obligations under this Paragraph 6.2 may be difficult to measure in monetary terms.  Both parties hereby agree that as such the disclosing party shall be entitled seek: a) to have the continuation of any such breach immediately and permanently enjoined; and b) an award of exemplary damages in an appropriate amount determined by a court of competent jurisdiction in the State of Arizona.

6.3    **Trademarks and Trade Names.**  Products may bear Motorola's trademarks, which Representative will not remove or efface.  Representative shall have no right under this Agreement to use the tradenames, trademarks, or logos of Motorola without Motorola's prior express written consent.  All use of such trademarks will inure solely to Motorola's benefit.  Representative will not directly or indirectly use any of Motorola's trademarks or part thereof, or any mark or name confusingly similar thereto, as part of its corporate or business name or in any other manner, except that: a) Representative may identify itself as an authorized Representative of Motorola in accordance with Motorola's written instructions; and b) upon Motorola's written consent, Representative may use Motorola's trademarks relating to the Products for display purposes in connection with solicitation of orders for Products.  In addition, Representative will not register any of Motorola's trademarks or any mark or name closely resembling them.

6.4    **Protection of Proprietary Rights.**  Representative will cooperate with and assist Motorola, at Motorola's expense, in the protection of trademarks, patents, or copyrights owned by or licensed to Motorola and will inform Motorola immediately of any infringements or other improper action with respect to such trademarks, patents, or copyrights that come to the attention of Representative.

## Article VII.  Term and Termination

7.1    **Term.**  Unless terminated as provided in Paragraph 7.2 below or by mutual written consent, this Agreement will continue in full force and effect for an initial term expiring one (1) year after the effective date hereof and thereafter may be renewed only upon the written Agreement of both parties.

7.2    **Termination.**  This Agreement may be terminated before expiration of the initial or any renewal term, as provided in Paragraph 7.1 above, by prior written notice to the other party as follows:

A.    By either party, in the event the other party should fail to perform any of its obligations hereunder and should fail to remedy such nonperformance within thirty (30) calendar days after receiving written demand therefore or, if the nature of the

11

default does not reasonably allow it to be remedied in thirty (30) days, the Agreement will be considered terminated if the defaulting party fails to take corrective action within thirty (30) days after receipt of a notice of default and intent to terminate from the nondefaulting party;

B.    By either party, effective immediately, if the other party should become the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceedings or make an assignment or other arrangement for the benefit of its creditors, or if such other party should be nationalized or have any of its material assets expropriated;

C.    By Motorola, effective immediately, if Representative should attempt to sell, assign, delegate, or transfer any of its rights and obligations under this Agreement without having obtained Motorola's prior written consent thereto, or if there should occur any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Representative;

D.    By Motorola, effective immediately, if any law or regulation should be adopted or in effect in the Territory that would restrict Motorola's termination rights or otherwise invalidate any provisions hereof;

E.    By Motorola, effective immediately, if Representative should violate the terms of Paragraph 2.7 above or otherwise in accordance with provisions of Paragraphs 4.5, 4.7 and 4.8;

F.    By Motorola, effective immediately, if Representative knowingly makes any false or untrue statements or representations to Motorola herein or in the performance of its obligations hereunder; and

G.    By either party, without cause after the initial 180 days following the effective date of this Agreement, on thirty (30) days prior written notice to the other party.

**7.3    Rights of Parties on Termination.** Upon termination or expiration of this Agreement:

A.    Representative will cease all sales and other activities on behalf of Motorola, return to Motorola and immediately cease all use of Confidential Information, turn over to Motorola Representative's current Customer mailing list and take such action as is necessary to terminate Representative's registration as Motorola's sales Representative with any government authority.

B.    All indebtedness of Representative to Motorola will become immediately due and payable without further notice or demand, which is hereby expressly waived. Both parties will be entitled to seek reimbursement for reasonable attorneys' fees that it may incur in collecting or enforcing payment of any such obligations under this Agreement.

C.    Representative will: a) remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by Motorola, or of any word, title, expression, trademark, design, or marking that, in the opinion of Motorola, is confusingly similar thereto; and b)

further certify in writing that Representative has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or similar expression that appeared in or on any devices or other materials used in conjunction with Representative's business.

D.     Representative shall not be eligible for any commissions in the case of termination by Motorola as described in Paragraphs 7.2 A through F.  Representative will be only be eligible for further commissions in the case of termination by Motorola pursuant to Paragraph 7.2 G and only on:

    1)   All direct open orders and new direct orders accepted and shipped within a period of 180 days as of the date of termination or expiration; and

    2)   All net distribution POS orders and new distribution POS orders accepted and shipped within a period of 180 days as of the date of termination or expiration.

E.     The obligations of Representative under Paragraphs 4.9, 4.10, 4.11 and Article VI will survive the termination or nonrenewal of this Agreement for any reason.

7.4     **Sole Remedy**.  Motorola's payment obligations in this Article VII shall be Representative's sole remedy for the termination or nonrenewal of this Agreement and will be in lieu of all other claims that Representative may have against Motorola as a result thereof.  Representative hereby waives its right to any termination compensation and damages it may have a right to under local law.  Motorola will not be liable to Representative by reason of termination or nonrenewal of this Agreement for compensation, reimbursement, or damages for:

A.   Loss of prospective compensation;

B.   Goodwill or loss thereof; or

C.   Expenditures, investments, leases, or any type of commitment made in connection with the business of such party or in reliance on the existence of this Agreement.

## Article VIII. Dispute Resolution

8.1     MOTOROLA and Representative agree to attempt to settle any claim or controversy arising out of this Agreement through consultation and negotiation in the spirit of mutual friendship and cooperation.  If such attempts fail, then the dispute may first be submitted to a mutually acceptable neutral advisor for initial fact finding in preparation for mediation or other form of alternate dispute resolution.  The Court shall finally determine any dispute that cannot be so resolved between the parties in good faith under Arizona law.

## Article IX. General Provisions

9.1     **Entire Agreement**.  This Agreement represents the entire agreement between the parties and supersedes all prior discussions, agreements, and understandings of every kind.  No modification of this Agreement will be effective unless in writing and signed by both

13

parties. Any and all side letters or supplementary agreements not specifically added to this agreement by amendment or addendum shall be of no effect whatsoever.

9.2    **Notices**. All notices under this Agreement will be in English and will be in writing and given by certified mail, overnight courier, or telefax (acknowledged by answerback) addressed to the parties at the addresses immediately below their respective signatures hereto, or to such other address of which either party may advise the other in writing. Notices will be deemed given when sent.

9.3    **Force Majeure**. Neither party will be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes will include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prohibit either party from ordering or furnishing Products or from performing any other aspects of the obligations hereunder, delays in transportation, and inability to obtain necessary labor, supplies, or manufacturing facilities.

9.4    **Severability**. Subject to the provisions of Paragraph 7.2D above, the illegality or unenforceability of any provision of this Agreement will not affect the validity and enforceability of any legal and enforceable provisions hereof.

9.5    **Nonassignment**. This Agreement will be binding on and inure to the benefit of the successors and assigns of the business interests of Motorola and may be assigned by Motorola only to the acquirer of substantially all of Motorola's assets in conjunction with such an acquisition. Representative will not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Motorola.

9.6    **Language**. The English language version of this Agreement will govern and control any translations of the Agreement into any other language.

9.7    **Applicable Law**. This Agreement will be construed, enforced, and performed in accordance with the internal laws of Arizona, U.S.A. without reference to principles of conflicts of laws and specifically excluding the UN Convention of the Sale of Goods with respect to any purchases hereunder. Use of Arizona law shall apply exclusively to this Agreement.

9.8 **Non-Solicitation**. During the term of this Agreement and for a period of eighteen (18) months following the expiration or termination of this Agreement, neither party or its successors and assigns will encourage or solicit any employee to leave the employ of the other without written approval; the foregoing does not prohibit mass media advertising not specifically directed towards any particular employee of the other party.

9.9    **Waiver**. Motorola's failure to require Representative's performance of the provisions herein will not operate as a waiver of Motorola's right to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

9.10    **Headings**. Headings are for convenience of reference only and are not a part of this Agreement, nor will they in any way affect interpretation hereof.

**IN WITNESS WHEREOF,** Motorola and Representative have caused this Agreement to be executed by their duly authorized employees.

Representative:
**Representative**

_Walter C. Reynold_
(Authorized Signature)

By: Walter C. Reynolds___ _WCR_

President_WALTER C. REYNOLDS_
(Title)

_2-24-03_
(Date)

Motorola Inc., Motorola Computer Group

_Jean A McCarthy_
(Authorized Signature)

_DENIS McCARTHY_
(Typed Name)

_V.P. + Director of Finance + IT._
(Title)

_3/18/2003._
(Date)

**ADDRESS FOR FORMAL NOTICE:**

West Coast Reps, Inc. _____
441 E. Whittier Blvd., Suite 3A_____
La Habra, CA 90631 _____


_____
Fax No. (562) 697-6167 _____
ATTENTION:  Walter C. Reynolds ____

**ADDRESS FOR FORMAL NOTICE:**

Motorola Computer Group
2900 S. Diablo Way, DW103
Tempe, AZ 85282 USA



Fax No. (602) 438-6246 _457-6246_
ATTENTION: Group Contracts

15

# Exhibit 1

## REPRESENTATIVE PRODUCT LIST AND COMMISSION RATES

### PRODUCT LIST

All MCG Board and System Products

### COMMISSION RATES:

Commissions for the monthly distributor POS run rate business in the Territory specified in Exhibit 2 shall be paid at a rate of five percent (5 %).

Commission for all new MCG direct business in which Representative is directly involved, as evidenced by registration of the opportunity by the Representative's MCG contact, shall be paid at a rate of five percent (5 %).



# Exhibit 2

## TERRITORY AND HOUSE ACCOUNT LIST

**Territory:**

The Territory for POS Distribution accounts is limited to the following accounts in the Southern California region:

| | |
|---|---|
| Boeing/McDonnel Douglas | Air Force |
| Raytheon | Army |
| Northrup Grumman (TRW) | Cubic Defense |
| Lockheed | General Atomics, Aeronautical Systems |
| BAE | Marines |
| General Dynamics | NASA |
| | SAIC |

All direct accounts within the Territory (Southern California) not called out as Motorola House Accounts or Legacy Projects.

**Motorola House Accounts:**

Nortel Networks
Motorola
General Electric Medical Systems
Tellabs
Marconi
Eastman Kodak
Alcatel
Scitex



17

# Exhibit 3

## FOREIGN CORRUPT PRACTICES ACT CERTIFICATION

While representing or distributing MOTOROLA products, and in consideration for entering into a Representative Agreement, I make the following covenants understanding that MOTOROLA will rely on these covenants in connection with my Agreement:

1. I acknowledge that I understand the requirements of the Foreign Corrupt Practices Act ("FCPA") and MOTOROLA'S Code of Conduct as they relate to my representation or distribution of MOTOROLA products. I will attend local or regional FCPA briefings as requested by MOTOROLA.

2. I will not, directly or indirectly, in connection with my Representative Agreement and business resulting therefrom offer, pay, promise to pay, or authorize the giving of money or anything of value (e.g. a promise of future employment, a retainer agreement) to any government official as defined in the FCPA (as amended), to any political party or official thereof or to any candidate for political office, or to any person, while knowing or being aware of a high probability that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any government official, to any political party or official thereof, or to any candidate for political office, for the purposes of:

   a) influencing any act or decision of such official, political party, party official, or candidate in his or its official capacity, including a decision to fail to perform his or its official functions; or

   b) inducing such official, political party, party official, or candidate to use his or its influence with the government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, to assist MOTOROLA in obtaining or retaining business for or with, or directing business to MOTOROLA. I understand that this payment prohibition is not limited to payments made from commission proceeds.

3. No partner, owner, principal or staff member of my organization are officials, officers or representatives of any government or political party or candidate for political office.

4. None of my compensation will be used for any purpose, nor will I take any action, which would constitute a violation of any law of the various jurisdictions in which I perform services or of the United States, including the FCPA. I will not seek to obtain or to provide to anyone documents or other information the disclosure of which is prohibited by the law of any jurisdiction in which I perform services, including any information regarding competitor's bids or proposals regardless whether the disclosure of such information is so prohibited.



5. My representation of MOTOROLA is permitted under local law, and I have complied with all local government registration, approval and disclosure requirements. I will make my financial records available to MOTOROLA and law enforcement authorities in case of alleged violation of the FCPA. I understand that the payment of all commissions will be made by wire transfer to my bank account in the country in which I am performing services.

6. I agree that I will obtain advance agreement in writing from MOTOROLA before incurring travel and entertainment expenses for, or providing gifts to, public officials or employees of any customer or potential customer involved in the purchase of MOTOROLA products. I understand that MOTOROLA will not approve any expenditure that would violate U.S. or local law.

7. I agree to indemnify MOTOROLA for all fines, fees and costs related to actual or alleged violation of any applicable law, including the FCPA, and I further agree that my Representative Agreement will be void ab initio upon discovery of any violation, whether or not investigated or prosecuted by the U.S. Government. In such case, I will surrender any claim for payment under all agreements with MOTOROLA, even for services already rendered, and will refund all payments previously received by me.

8. The services described in my Representative Agreement are services which I have the capacity to perform and are the only services for which I am being compensated. I understand that any invoice that I submit describing services performed is a certification that the services in question have actually been performed and are the only services giving rise to the invoice. The submission of a false or inaccurate invoice will be grounds for immediate termination of the Agreement.

9. I agree to provide MOTOROLA written updates to the information form that I completed in order for MOTOROLA to perform its FCPA due diligence review. I will provide such updates whenever there is a material change in the information previously provided, but in no event less frequently than annually (beginning January 30 of _____) and no later than January 30 of each succeeding year in which I am under contract with MOTOROLA.

_Walter G. Reynolds_

**Authorized Signature**

**MOTOROLA REPRESENTATIVE**

WCR Rep Agmt2-19

Rev. Date January 2003



# Exhibit 4

## Performance Standards

### A) Customer Opportunity Requirements

Definitions:

**Design Win (Level 4):** A Committed Account/Program is classified as a Design Win when a) a new customer buys MCG product or b) an existing MCG customer buys product for a new or redesigned program. The project or account must transition to run rate business. A valid Design Win must meet the Design Win Revenue Baseline.

**Design Win Revenue Baseline:**

    a) Military/Aerospace Opportunities - $100K Annual; and

    b) Other - $250K Annual.

**Target Account/Program (Level 1):** A new suspect account or program with profile fitting MCG product and services. Program may or may not be funded and MCG product may or may not be a fit.

**Uncommitted Account/Program (Level 2):** A previous Target Account/Program that has subsequently been to funded by the customer with assigned personnel working design requirements and possible solutions where MCG has an opportunity to be a supplier of products and/or services.

**Committed Account/Program (Level 3):** An Uncommitted Account/Program that has become a program where customer has actually purchased MCG product for development specific to the program.

| | Q1 | Q2 | Q3 | Q4 | Q5 | Comments |
|---|---|---|---|---|---|---|
| Targets | 10 | 25 | 40 | 55 | 70 | Target opptys are cumulative - some |
| Per Qtr | | 15 | 15 | 15 | 15 | move to uncommitted |
| Uncommitted | | 3 | 9 | 19 | 290 | Uncommitted opptys are cumulative - |
| Per Qtr | | | 6 | 10 | 10 | some move to committed |
| Committed | | 2 | 5 | 9 | 14 | New committed opptys |
| Per Qtr | | | 3 | 4 | 5 | |
| Total New Rev - Mil/Aero | | $500K | $750K | $1,000K | $1,250K | |
| Total New Rev - Other | | | | | | |



## B. Territorial Development Requirements

A. In conjunction with MCG, participate/promote a minimum of four public seminars per year.

B. In conjunction with Motorola and/or its distributors, participate in a minimum of one territory specific sales promotion per year.

C. Support Motorola's efforts at shows with promotion and personnel attendance.

D. Submit monthly account update reports on lead follow up, account calls and other pertinent activity.

E. Insure all sales personnel receive a minimum of 24 hours of training on MCG products and services. This may include recorded webinars and/or live training presented by Motorola.

# EXHIBIT B

 **MOTOROLA**

February 26, 2004

VIA OVERNIGHT DELIVERY

West Coast Reps, Inc.
441 E. Whittier Blvd.
Suite 3A
La Habra, CA 90631

Attn: Mr. Walter C. Reynolds

Dear Mr. Reynolds:

Motorola Computer Group ("Motorola") entered into a Manufacturer
Representative Agreement (the "Agreement") with West Coast Reps ("WCR")
effective March 18, 2003. By its terms, the Agreement expires March 17, 2004.
Motorola is writing this letter to confirm its understanding that its contractual
relationship with WCR will end on March 17, 2004.

Motorola wishes WCR the best of luck in the future. Should WCR have any
questions about this letter, please call Kim Crawford.

Sincerely,


Dana Huth
Vice President, Motorola Computer Group, Inc
Worldwide Sales & Market Development

# EXHIBIT C

# MANUFACTURER'S REPRESENTATIVE AGREEMENT

between

## MOTOROLA COMPUTER GROUP

and

## RT TECHNOLOGIES INC

# TABLE OF CONTENTS

Article I. Definitions.................................................................................................3

Article II. Appointment and Scope ...........................................................................3

Article III. Representative's Compensation .............................................................4

Article IV. Representative Obligations ....................................................................7

Article V. Motorola Obligations ..............................................................................9

Article VI Confidentiality and Proprietary Rights................................................10

Article VII. Term and Termination.........................................................................11

Article VIII. Dispute Resolution.............................................................................12

Article IX. General Provisions ...............................................................................13

LIST OF EXHIBITS

- EXHIBIT 1: REPRESENTATIVE PRODUCT LIST/COMMISION RATES
- EXHIBIT 2: TERRITORY, HOUSE ACCOUNT, AND LEGACY PROJECT LISTS
- EXHIBIT 3: FOREIGN CORRUPT PRACTICES ACT CERTIFICATION
- EXHIBIT 4: PERFORMANCE STANDARDS

THIS AGREEMENT is made and effective on the date of the last signature below by and between Motorola Inc., a Delaware corporation, by and through its Computer Group having an office at 2900 South Diablo Way, Tempe Arizona, United States of America ("Motorola"), and RT Technologies, a Division of DSPCon, Inc. a Corporation organized under the laws of New Jersey, and having an office address of 380 Foothill Road, Bridgewater, NJ 08807. ("Representative").

## Article I. Definitions

1.1     **Agreement.** "Agreement" means this document and any exhibit, attachment, schedule, addendum, or modification unless the context otherwise indicates.

1.2     **Customer.** "Customer(s)" means any purchaser of Products from Motorola for end use in the Territory.

1.3     **Products.** "Products" means those Motorola products and systems that are specifically identified at Exhibit 1.

1.4     **Confidential Information.** "Confidential Information" means all information which is disclosed in oral, written, graphic, machine recognizable, and/or sample form, and which is clearly designated, labeled or marked as confidential or its equivalent and includes all know-how, designs, drawings, specifications, catalogs, data sheets, sales and technical bulletins, service manuals, mechanical diagrams, and all other information relating to the design, manufacture, use, and service of the Products, including any other information relating to Motorola's business that may be sent to Representative during performance of this Agreement and that is not generally known in the trade.

1.5     **Territory.** "Territory" is limited to the area or specified accounts identified in Exhibit 2.

## Article II. Appointment and Scope

2.1     **Appointment.** Subject to the terms, conditions and duration of this Agreement, Motorola appoints Representative as a non-exclusive, independent manufacturer's representative of the Products for end use in the Territory at such prices and upon such terms and conditions as established by Motorola. Representative accepts this appointment and agrees to devote such time and attention to the performance of such duties as may be reasonably necessary. Representative shall not, without Motorola's written authorization, register as Motorola's representative in any country or jurisdiction other than Territory.

2.2     **Territory Exclusivity.** This appointment is non-exclusive. While it is not currently Motorola's intent, Motorola retains the right to appoint additional sales representatives, agents, distributors or other representative for Products in or for the Territory. Motorola may also at any time sell any Products directly, as identified in Exhibit 1 or by written notice as provided for in paragraph 3.1, or indirectly through any Motorola subsidiary or affiliate without incurring any commission or other payment obligation to Representative of any type or nature. Motorola specifically reserves the House Accounts and Legacy Projects listed in Exhibit 2 as Motorola direct accounts for which Representative will not be entitled to receive any commission, including cases where a House Account or Legacy Project places an order through Motorola's distributors.

2.3     **Distribution Outside Territory.** Representative will limit its Product sales activities to Customers within the Territory and will not market Products outside the Territory.

2.4    **Agents and Subrepresentatives.** Representative may not appoint any agent, subrepresentative, or other person ("Sub-Agent") to promote Product sales or to otherwise perform any of Representative's obligations without Motorola's prior written approval and compliance with Motorola's policy for obtaining such approval. Motorola's approval of any such Sub-Agent shall be based upon Motorola's review of information provided by Representative. Any such approval shall not be deemed to create any obligation between Motorola and Sub-Agent. Actions of Sub-Agents shall be the sole responsibility of Representative and Representative agrees to indemnify and hold Motorola harmless against any and all acts, whether unintentional or deliberate, on the part of the Sub-Agent. Prior to furnishing any Product to a Sub-Agent, Representative shall obtain a signed agreement from such Sub-Agent consistent with the terms of this Agreement and shall, among other things, require that the Sub-Agent comply with the United States Foreign Corrupt Practices Act and Motorola's Code of Business Conduct. Sub-Agents will in no event be allowed to describe themselves or advertise themselves as Motorola authorized representatives or distributors.

2.5    **Independent Contractor Status.** Representative is an independent contractor who will not be considered a Motorola employee, agent or legal representative for any purpose; neither Representative nor any of its directors, officers, employees or agents will be, or will be considered, a Motorola agent or employee. Representative is not granted and will not exercise any right or authority to assume or create any obligation or responsibility on behalf of, or in the name of, Motorola. Specifically, Representative does not have authority, on Motorola's behalf, to: a) contract or make commitments; b) change prices or terms and conditions of sales; c) make warranties, oral or written, express or implied concerning Products; or d) take any action which would result in Motorola's liability for state, federal, or local taxes or any expenses of any kind.

2.6    **Operations and Expenses.** Representative's detailed operations under this Agreement are subject to the sole control and management of Representative. Except for training as may be provided by Motorola under Section 5.5, Representative is responsible for all its own expenses and employees and for providing, at its own expense, such office space, facilities, and training as may be required to carry out its obligations under this Agreement. Representative will incur no expense chargeable to Motorola, except as specifically authorized in advance in writing by Motorola. Any such chargeable expense shall be documented in accordance and consistent with applicable Motorola policies.

2.7    **Noncompetition.** Representative will not sell, offer for sale, or act as sales agent for the solicitation of orders for any products that are competitive with any of the Products as defined by Motorola; nor will Representative engage in any activity that may result in a relationship with current or future customers that creates a conflict of interest as defined by Motorola.

## Article III. Representative's Compensation

3.1    **Commissions.** For services detailed in this Agreement, commissions will be based upon the Net Sales Price of Product for those orders to Motorola from either Motorola's distributors or those direct Customers that are in the Territory, other than Motorola House Accounts and Legacy Projects. Eligible orders shall be limited to those received by Motorola after the effective date of this Agreement and registered through the Motorola registration system, whether registered by Motorola's distributor for indirect orders or new orders registered by Representative, through its Motorola contact, for direct orders. Net Sales Price is defined as the:

(1) actual price (i.e., original contract price adjusted by change orders and termination orders) paid to Motorola by Customers for direct orders less any discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any; or

(2) Motorola list price less the then current Motorola distributor discount for indirect orders less any additional discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any.

The commission rate is identified for each Product in Exhibit 1. This agreed to commission rate is subject to subsequent reduction should business circumstances dictate or as may be restricted by law, regulation or contract with the Customer.

Motorola may make adjustments to authorized Territory and direct accounts upon written notice to Representative. In such cases of adjusted Territory and/or direct accounts, Representative will be eligible for a commission, pursuant to the commission schedule included in Exhibit 1, on all orders accepted and shipped within a period of 120 days following the date of adjustment for orders effected by those Territory and direct accounts changes.

3.2    **Net Sales Price Changes.** If: (a) the Net Sales Price changes after acceptance of the order by Motorola; or (b) credit is granted or a refund is made to a Customer for returned Products, and such change, credit or refund results in a different commission from the commission derived from Paragraph 3.1 above, any over or underpayment will be: (i) subtracted from or added to the next commission payment payable to Representative; or (ii) refunded by or paid to Representative within 30 days of written notice by Motorola if no further commissions are to become due.

3.3    **Billing Documents.** Any and all billing documentation which Motorola may provide to its Customers will be in accordance with Motorola's standard invoicing techniques reflecting the actual terms and conditions (prices, terms, commissions, etc.) of the sales transaction. Under no circumstances will a Customer be invoiced at other than the actual sales price.

3.4.    **Payments.** Commissions are earned on orders when payments of the invoices have been received from Customers, or on behalf of Customers, whether such payments are in whole or in part and shall be payable in accordance with Motorola standard policy of payment to third party representatives. Where payment is less than the full amount due on an invoice, the commission earned will be limited to the applicable commission rate multiplied by the amount actually received. Commissions earned may be subject to delay based upon milestone payments to Motorola, payment holdbacks and performance bond requirements and which delay shall be agreed to in writing by the parties prior to final customer contract award. Commissions earned will accumulate monthly and be due and payable on the end of the month following the month in which Customer payments have been received Commissions will be made payable to Representative and transmitted by mail to Representative's business address or such other means as are permissible under the laws of the Territory and the United States of America and in accordance with the internal policies of Motorola. Representative represents and warrants that it will report and disclose all commissions, fees or other types of compensation received under this Agreement as required under law.

3.5   **Refusal to Accept Orders.** Representative's entitlement to a commission depends on Motorola's acceptance of Customer orders during the term of this Agreement and Representative's efforts to secure such orders.   Motorola's failure or refusal to accept any order for any reason shall not create an obligation to pay either a commission or any damages in lieu thereof, nor shall any delay or default in the performance of any accepted order create an obligation to pay a commission or any claimed damages. Motorola shall not be obligated to make any commission payments for any orders received or accepted before the effective date of this Agreement, for sales from one government to another government, or for any order which is not, in Motorola's opinion, the result of Representative's efforts consistent with the terms and conditions of this Agreement.

3.6   **Commission Changes.** Commission levels may be amended by Motorola from time to time on all future business opportunities and will be effective 180 Days after written notice to Representative.

3.7   **Commission Restrictions.** MOTOROLA WILL NOT PAY A COMMISSION WHERE PROHIBITED OR TO THE EXTENT LIMITED BY UNITED STATES OR LOCAL LAW OR REGULATION, OR BY ANY CONTRACTUAL, FINANCING, OR OTHER SIMILAR PROVISION.  REPRESENTATIVE ASSUMES THE RISK THAT A COMMISSION MIGHT BE SUBJECT TO A PROHIBITION OR LIMIT AND THAT REPRESENTATIVE WILL NOT BE PAID AS A RESULT. REPRESENTATIVE IS ENCOURAGED TO REVIEW LOCAL LAW, LOCAL REGULATIONS, POTENTIAL CONTRACTS, AND FINANCING ARRANGEMENTS FOR PROHIBITIONS OR LIMITATIONS ON COMMISSIONS. IF PAYMENT OF A COMMISSION IS LIMITED, BUT NOT ENTIRELY PROHIBITED, BY APPLICABLE UNITED STATES OR LOCAL LAW OR REGULATION, CONTRACT OR FINANCING ARRANGEMENTS, MOTOROLA AND REPRESENTATIVE MAY NEGOTIATE PAYMENT OF COMMISSION ON A CASE-BY-CASE BASIS WITHOUT OBLIGATING MOTOROLA TO PAY A COMMISSION IN EXCESS OF SUCH LIMITATIONS EXCEPT TO THE EXTENT IT AGREES IN ADVANCE AND IN WRITING.

Commissions on the sale of products pursuant to Foreign Military Sales/Foreign Military Financing (FMS/FMF), NATO and other sales where commissions may be otherwise restricted shall be payable in accordance with the relevant local law and United States law and regulations as follows:

1) Where there is no restriction on commissions, a commission will be paid at the agreed to rate as defined in Paragraph 3.1.

2) Where commissions are restricted, Motorola will pay a commission at the agreed to rate, not to exceed the amount restricted by law or regulation, or as otherwise specifically stipulated to by the Customer in writing prior to contract award.

3) Where a commission is prohibited, Motorola will pay no commission.

3.8   **Limitation of Liability.** IN NO EVENT, WHETHER FOR BREACH OF CONTRACT, WARRANTY, MOTOROLA'S NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE WILL MOTOROLA BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, LOSS OF PROFITS, LOSS OF DATA, COST OF CAPITAL, COST OF SUBSTITUTION OF PRODUCTS, FACILITIES OR SERVICES, DOWNTIME, COSTS, OR ANY SIMILAR CLAIM OF A SPECIAL, INCIDENTAL,

CONSEQUENTIAL OR PUNITIVE NATURE WHATSOEVER TO THE FULL EXTENT
PERMITTED BY APPLICABLE LAW.

3.9    **Claims Procedures.**  Any dispute or claim against Motorola related to this Agreement, or its
expiration or termination, requires written notice to Motorola within one hundred eighty (180) days of
the event giving rise to the claim.  Failure to give such notice will constitute a waiver of any claim against
Motorola and will relieve Motorola from any and all liability on any such claim.

3.10    **Offsets.**  Any credits, allowances, or other amounts payable or creditable to Representative by
Motorola will be subject to offset for any claims or other amounts owed by Representative to Motorola
pursuant to the provisions of this Agreement or otherwise.

3.11    **Taxes.** All taxes (including, but not limited to, income, withholding, sales, use, registration, ad
valorem, excise, employment and documentary taxes), duties, excises or other such charges imposed by
governmental or quasi-governmental bodies relating to the sale, shipment, acquisition, holding and
disposition of Products by Representative or Representative's actions or presence in the Territory or
any performance under this Agreement that are not the responsibility of the Customer will be paid by
Representative, which agrees to indemnify and hold harmless Motorola or any Motorola Affiliate with
respect to any such charges paid by Motorola or any Motorola Affiliate.

## Article IV. Representative Obligations

4.1    **Sales Promotion.**  Representative will use best efforts to promote the sale and use of Products
in Territory. Representative will immediately submit to its contact within Motorola all leads, forecasts,
purchase orders, and other communications Representative develops or receives from a Customer or
prospective Customer for the Products.

Representative must register all sales efforts and leads through the Motorola registration system for
those opportunities that may result in direct orders to Motorola and will be eligible for a commission on
only those direct orders so registered. Motorola will direct Representative as to the method of adequate
registration.

4.2    **Facilities and Personnel.**  Representative will maintain, at its own expense, such office space
and facilities, and hire and train such personnel, as may be required to carry out its obligations under this
Agreement.

4.3    **Promotional Materials.** Representative will maintain an adequate inventory of Motorola's
current sales material and samples for use in an efficient and effective manner to promote the sale of
Products in the Territory. At Motorola's request, Representative will not use any non-Motorola
advertising or promotional materials to promote the Products without Motorola's prior written approval.

4.4    **Performance Standards.** Representative agrees to maintain minimum performance standards
as provided in Exhibit 4, which standards may be amended from time to time by written consent of both
parties. If Representative fails to meet such minimum performance standards, Motorola may terminate
this Agreement for cause in accordance with Paragraph 7.2A.

4.5    **Sales Policies.**  Representative will comply, and will cause its employees and agents to
comply, with all Motorola sales policies and the Motorola Code of Ethics and Business Conduct and
the United States Foreign Corrupt Practices Act.

4.6   **Service and Training.** Representative will assist Motorola in arranging for warranty, maintenance, and repair service for all Customers. Representative will ensure that appropriate personnel attend any local or regional training as Motorola reasonably requires.

4.7   **Local Law.** Representative will notify Motorola of the existence and content of any mandatory provision of law in the Territory or any other applicable law that conflicts with or otherwise affects any provision of this Agreement at the time of its execution or thereafter. Representative agrees to comply with all laws and regulations of the Territory. Failure to comply with this Paragraph 4.7 will be considered a material breach of this Agreement, allowing Motorola to terminate this Agreement effective immediately upon notice to Representative under Paragraph 7. 2E hereof.

4.8   **Questionable Payments.** Representative and Motorola shall use only ethical and legitimate business practices in the activities contemplated by this Agreement. Neither party shall engage in any improper gifts or payments in connection with the marketing or sale of any Product under this Agreement nor engage in any other improper, illegal or unethical conduct. In addition, Representative agrees to cooperate fully with Motorola in any investigation of such matters. As used in this paragraph, the term unethical conduct shall include improper, illegal or unethical conduct and corrupt payments within the meaning of the Motorola Code of Business Conduct, the United States Foreign Corrupt Practices Act (15 United States Code Section 78dd-1 and -2) and local anti-corruption laws. Representative certifies that neither it, nor any of its directors, officers, employees, or agents is an official, agent, or employee of any government or governmental agency or political party or a candidate for any political office as of the effective date of this Agreement. Representative represents and warrants that all information provided to Motorola during the process of qualification of Representative, is true, accurate and correct and that Representative will promptly notify Motorola of any change to that information or of any event that would or may result in an exception to the representations contained in this Agreement. Representative will require each of its directors, officers, employees, and agents to comply with the provisions of this Paragraph 4.8, and it will ensure that appropriate personnel attend any regional Motorola briefings on this topic. Motorola will make available to Representative the Motorola Code of Business Conduct and any other information requested under this Paragraph 4.8. Notwithstanding any provision of this Agreement, any breach of the provisions of this Paragraph 4.8 will be considered a material breach of this Agreement and entitle Motorola to terminate this Agreement effective immediately on notice to Representative under Paragraph 7.2E and may result in Representative's surrender of any claim for payment under this Agreement and the refund any payment received. Representative shall certify to the representations and warranties contained in this Paragraph 4.8 by reading and executing Exhibit 3 prior to the execution of this Agreement.

4.9   **Indemnification.** Representative agrees to indemnify, defend and save Motorola harmless from and against all claims, proceedings, losses, penalties, damages or actions, and all expenses incidental to any investigation, negotiation or defense thereof, based upon, arising out of, or in connection with: a) damage or injury (including death) to persons, property, reputation, or business opportunity, caused by or sustained in connection with the performance of services hereunder or by conditions created hereby, except for damage or injury resulting solely and directly from Motorola's negligence or willful misconduct; b) breach of any of the provisions of this Agreement; c) negligence or other tortious conduct; d) representations or statements not specifically authorized by Motorola in this Agreement or in writing; e) violation by Representative (or any of its directors, officers, employees or agents) of any

applicable law, regulation, or order in the Territory or of the United States; or f) any material misrepresentation or omission made by Representative in connection with the information supplied relative to paragraph 4.12.

Motorola will indemnify and hold Representative, its officers, directors, employees, successors, and assigns harmless against all claims and losses, that may be sustained as a result of: a) breach of any of the material provisions of this Agreement; b) disputes between Motorola and its customers to the extent that such dispute is due solely to Motorola's negligence or non-performance; or c) any material misrepresentation or omission made by Motorola in connection with the Products.

4.10   **Insurance.**  Both parties agree to maintain adequate financial resources or insurance to fulfill their financial responsibilities under this Agreement.

4.11   **Security.**  If, during this Agreement, Representative is involved in negotiations with sovereign governments or agencies for sale or use of Motorola Products by such governments or agencies requiring security clearance of Representative's personnel, Representative agrees to cooperate fully, to undertake at Representative's expense to acquire the necessary security clearance as requested by the governments or agencies and to observe all regulations or instructions issued by such governments or agencies with respect to such security clearance and maintenance of security.

4.12   **Due Diligence Review.**  Representative, prior to initial appointment as a representative hereunder and any subsequent renewals, shall provide information to Motorola in order for Motorola to perform a due diligence review to assess Representative's ability to perform its obligations under this Agreement. Representative represents and warrants and will, at the time of submission, certify that all information supplied in accordance with Motorola's request is complete and accurate and that Representative will immediately notify Motorola of any and all changes to that information.

## Article V. Motorola Obligations

5.1   **Sales Support.**  Motorola will provide Representative English language sales and marketing information for Products and furnish at reasonable cost such catalogs, specifications, promotional literature, and other materials pertaining to Products as are available.

5.2   **Advertising Programs.**  Motorola may advertise in the Territory, with or without consultation with Representative.

5.3   **Notification of Changes.**  Motorola will advise Representative, either in writing or by electronic means, of any changes in or affecting the Products or prices, terms and conditions of sale, sales policies, projected delivery dates, schedule changes, and other matters that Motorola determines may affect the business of Representative.

5.4   **Assistance.**  Motorola will provide Representative reasonable access to and assistance of its technical, sales, and service personnel as Motorola deems appropriate. Such assistance will be without charge to Representative except as otherwise mutually agreed.

5.5   **Training.**  Motorola will conduct, and Representative will cause its personnel to attend, such technical and sales training sessions for Products as Motorola deems necessary to allow Representative to effectively market the Products. Such training will be provided without charge to Representative. All

compensation, transportation, or living expenses of Representative's personnel while in attendance at such training sessions will be borne by Representative.

## Article VI Confidentiality and Proprietary Rights

6.1    **Confidential Information.** Both parties acknowledge that Confidential Information is valuable and proprietary. The receiving party will hold Confidential Information in strict confidence for five (5) years after expiration or termination of this Agreement and will not disclose it to any other person, firm, or corporation without the disclosing party's prior written approval. This obligation will not extend to information which is now available or becomes available to the public without breach of this Agreement, is released in writing by disclosing party, is lawfully obtained from a third party or parties without confidential obligation, is known to the receiving party prior to such disclosure or is at any time developed by the receiving party independently of any such disclosure or disclosures from the disclosing party.

6.2    **Use of Confidential Information.** The receiving party will limit its use of Confidential Information and any patent, trademark, or other intellectual property rights of the other party to implementation of this Agreement. Representative shall place the following legend on all Motorola Confidential Information disclosed by Representative to its government customers:

"The information contained in this document is submitted in confidence, is privileged and exempt from disclosure under the "Freedom of Information Act" (5 U.S.C. Section 552) by reason of exemptions in Sections (b)(3) by reference to 18 U.S.C. Section 1905 - and (b)(4) of said act."

Both parties acknowledge that damages sustained as a consequence of any breach of the other party's obligations under this Paragraph 6.2 may be difficult to measure in monetary terms. Both parties hereby agree that as such the disclosing party shall be entitled seek: a) to have the continuation of any such breach immediately and permanently enjoined; and b) an award of exemplary damages in an appropriate amount determined by a court of competent jurisdiction in the State of Arizona.

6.3    **Trademarks and Trade Names.** Products may bear Motorola's trademarks, which Representative will not remove or efface. Representative shall have no right under this Agreement to use the tradenames, trademarks, or logos of Motorola without Motorola's prior express written consent. All use of such trademarks will inure solely to Motorola's benefit. Representative will not directly or indirectly use any of Motorola's trademarks or part thereof, or any mark or name confusingly similar thereto, as part of its corporate or business name or in any other manner, except that: a) Representative may identify itself as an authorized Representative of Motorola in accordance with Motorola's written instructions; and b) upon Motorola's written consent, Representative may use Motorola's trademarks relating to the Products for display purposes in connection with solicitation of orders for Products. In addition, Representative will not register any of Motorola's trademarks or any mark or name closely resembling them.

6.4    **Protection of Proprietary Rights.** Representative will cooperate with and assist Motorola, at Motorola's expense, in the protection of trademarks, patents, or copyrights owned by or licensed to Motorola and will inform Motorola immediately of any infringements or other improper action with respect to such trademarks, patents, or copyrights that come to the attention of Representative.

# Article VII. Term and Termination

7.1    **Term.** Unless terminated as provided in Paragraph 7.2 below or by mutual written consent, this Agreement will continue in full force and effect for an initial term expiring one (1) year after the effective date hereof and thereafter may be renewed only upon the written Agreement of both parties.

7.2    **Termination.** This Agreement may be terminated before expiration of the initial or any renewal term, as provided in Paragraph 7.1 above, by prior written notice to the other party as follows:

A.    By either party, in the event the other party should fail to perform any of its obligations hereunder and should fail to remedy such nonperformance within thirty (30) calendar days after receiving written demand therefore or, if the nature of the default does not reasonably allow it to be remedied in thirty (30) days, the Agreement will be considered terminated if the defaulting party fails to take corrective action within thirty (30) days after receipt of a notice of default and intent to terminate from the nondefaulting party;

B.    By either party, effective immediately, if the other party should become the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceedings or make an assignment or other arrangement for the benefit of its creditors, or if such other party should be nationalized or have any of its material assets expropriated;

C.    By Motorola, effective immediately, if Representative should attempt to sell, assign, delegate, or transfer any of its rights and obligations under this Agreement without having obtained Motorola's prior written consent thereto, or if there should occur any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Representative;

D.    By Motorola, effective immediately, if any law or regulation should be adopted or in effect in the Territory that would restrict Motorola's termination rights or otherwise invalidate any provisions hereof;

E.    By Motorola, effective immediately, if Representative should violate the terms of Paragraph 2.7 above or otherwise in accordance with provisions of Paragraphs 4.5, 4.7 and 4.8;

F.    By Motorola, effective immediately, if Representative knowingly makes any false or untrue statements or representations to Motorola herein or in the performance of its obligations hereunder; and

G.    By either party, without cause after the initial 180 days following the effective date of this Agreement, on thirty (30) days prior written notice to the other party.

7.3    **Rights of Parties on Termination.** Upon termination or expiration of this Agreement:

A.    Representative will cease all sales and other activities on behalf of Motorola, return to Motorola and immediately cease all use of Confidential Information, turn over to Motorola Representative's current Customer mailing list and take such action as is necessary to terminate Representative's registration as Motorola's sales Representative with any government authority.

B.    All indebtedness of Representative to Motorola will become immediately due and payable without further notice or demand, which is hereby expressly waived. Both parties will be entitled

to seek reimbursement for reasonable attorneys' fees that it may incur in collecting or enforcing payment of any such obligations under this Agreement.

C.    Representative will: a) remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by Motorola, or of any word, title, expression, trademark, design, or marking that, in the opinion of Motorola, is confusingly similar thereto; and b) further certify in writing that Representative has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or similar expression that appeared in or on any devices or other materials used in conjunction with Representative's business.

D.    Representative shall not be eligible for any commissions in the case of termination by Motorola as described in Paragraphs 7.2 A through F.  Representative will be only be eligible for further commissions in the case of termination by Motorola pursuant to Paragraph 7.2 G and only on:

    1)    All direct open orders and new direct orders accepted and shipped within a period of 180 days as of the date of termination or expiration; and

    2)    All net distribution POS orders and new distribution POS orders accepted and shipped within a period of 180 days as of the date of termination or expiration.

E.    The obligations of Representative under Paragraphs 4.9, 4.10, 4.11 and Article VI will survive the termination or nonrenewal of this Agreement for any reason.

7.4    **Sole Remedy.**  Motorola's payment obligations in this Article VII shall be Representative's sole remedy for the termination or nonrenewal of this Agreement and will be in lieu of all other claims that Representative may have against Motorola as a result thereof.  Representative hereby waives its right to any termination compensation and damages it may have a right to under local law.  Motorola will not be liable to Representative by reason of termination or nonrenewal of this Agreement for compensation, reimbursement, or damages for:

A.    Loss of prospective compensation;

B.    Goodwill or loss thereof; or

C.    Expenditures, investments, leases, or any type of commitment made in connection with the business of such party or in reliance on the existence of this Agreement.

## Article VIII. Dispute Resolution

8.1    MOTOROLA and Representative agree to attempt to settle any claim or controversy arising out of this Agreement through consultation and negotiation in the spirit of mutual friendship and cooperation.  If such attempts fail, then the dispute may first be submitted to a mutually acceptable neutral advisor for initial fact finding in preparation for mediation or other form of alternate dispute resolution.  The Court shall finally determine any dispute that cannot be so resolved between the parties in good faith under Arizona law.

## Article IX. General Provisions

9.1    **Entire Agreement.** This Agreement represents the entire agreement between the parties and supersedes all prior discussions, agreements, and understandings of every kind. No modification of this Agreement will be effective unless in writing and signed by both parties. Any and all side letters or supplementary agreements not specifically added to this agreement by amendment or addendum shall be of no effect whatsoever.

9.2    **Notices.** All notices under this Agreement will be in English and will be in writing and given by certified mail, overnight courier, or telefax (acknowledged by answerback) addressed to the parties at the addresses immediately below their respective signatures hereto, or to such other address of which either party may advise the other in writing. Notices will be deemed given when sent.

9.3    **Force Majeure.** Neither party will be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes will include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prohibit either party from ordering or furnishing Products or from performing any other aspects of the obligations hereunder, delays in transportation, and inability to obtain necessary labor, supplies, or manufacturing facilities.

9.4    **Severability.** Subject to the provisions of Paragraph 7.2D above, the illegality or unenforceability of any provision of this Agreement will not affect the validity and enforceability of any legal and enforceable provisions hereof.

9.5    **Nonassignment.** This Agreement will be binding on and inure to the benefit of the successors and assigns of the business interests of Motorola and may be assigned by Motorola only to the acquirer of substantially all of Motorola's assets in conjunction with such an acquisition. Representative will not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Motorola.

9.6    **Language.** The English language version of this Agreement will govern and control any translations of the Agreement into any other language.

9.7    **Applicable Law.** This Agreement will be construed, enforced, and performed in accordance with the internal laws of Arizona, U.S.A. without reference to principles of conflicts of laws and specifically excluding the UN Convention of the Sale of Goods with respect to any purchases hereunder. Use of Arizona law shall apply exclusively to this Agreement.

9.8 **Non-Solicitation.** During the term of this Agreement and for a period of eighteen (18) months following the expiration or termination of this Agreement, neither party or its successors and assigns will encourage or solicit any employee to leave the employ of the other without written approval; the foregoing does not prohibit mass media advertising not specifically directed towards any particular employee of the other party.

9.9    **Waiver.** Motorola's failure to require Representative's performance of the provisions herein will not operate as a waiver of Motorola's right to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

**9.10   Headings.** Headings are for convenience of reference only and are not a part of this Agreement, nor will they in any way affect interpretation hereof.

**IN WITNESS WHEREOF,** Motorola and Representative have caused this Agreement to be executed by their duly authorized employees.

Representative:
**RT Technologies,**

**a Division of DSPCon, Inc.**

_____
(Authorized Signature)

Al Brower  _ALFRED N. BROWER_
(Typed Name)

President of DSPCon _____
(Title)

_____5/8/2003_____
(Date)

**Motorola Inc., Motorola Computer Group**

_____ (for Wendy Vittori)
(Authorized Signature)

Wendy Vittori
(Typed Name)

Vice President and General Manager
(Title)

5/15/03
(Date)

**ADDRESS FOR FORMAL NOTICE:**

RT Technologies Inc.

380 Foothill Road

Bridgewater, NJ 08807

Fax No. (301) 869-2774

ATTENTION: Joe Palermino

**ADDRESS FOR FORMAL NOTICE:**

Motorola Computer Group

2900 S. Diablo Way, DW103

Tempe, AZ  85282  USA

Fax No. (602) 437-6246

ATTENTION: Group Contracts

# Exhibit 1

## REPRESENTATIVE PRODUCT LIST AND
## COMMISSION RATES

### PRODUCT LIST

All MCG Board and System Products

### COMMISSION RATES:

Commissions for the monthly distributor POS run rate business in the Territory shall be paid at a rate of Five percent (5%).

Commission for all new MCG direct business in which Representative is directly involved, as evidenced by registration of the opportunity by the Representative's MCG contact, shall be paid at a rate of Five percent (5%).

A $5000 signing Bonus will be paid to RT Technologies within the first 60 days after execution of this agreement.

# Exhibit 2

## TERRITORY, HOUSE ACCOUNT, AND LEGACY PROJECT LISTS

**Territory:**

All POS Distribution accounts in Maryland, Virginia and the District of Columbia not called out as Motorola House Accounts or Legacy Projects.

All new direct accounts within the Territory not called out as Motorola House Accounts or Legacy Projects.

**Motorola House Accounts:**

Nortel Networks
Motorola
Hughes Network Systems
General Electric Medical Systems
Tellabs
Marconi
Eastman Kodak
Alcatel
Scitex

All MCG product purchases through Value Added Resellers, Contract Manufacturers and/or Distribution that are purchased for the above account sites are also included under Motorola House Accounts List whether currently in or moved to the above defined Territory.

**Motorola Legacy Projects:**

| Customer Name | Project Name | PID/RegID |
|---|---|---|
| AAI Corporation | GNSS | AL1821196447 ( MVME2700) |
| AAI Corporation | FFG | CU3626242542 (MVME2400) |
| ACE*Comm | DCMS | AL2022232459: (MVME147/712) |
| Applied Physics Lab | CEC | 28535 (MVME5101 & MVME5110) |
| Applied Physics Lab | WASP | 30660 (MVME2700 board) |
| Lockheed Martin NE&SS – Manassas | ARC1 / MPP | AL1322252825 ( SMM2304 & MVME2304) |
| Tecore | Aircore/HA | AL1525223120; (CPX8216 system) |

# Exhibit 3

# FOREIGN CORRUPT PRACTICES ACT
# CERTIFICATION

While representing or distributing MOTOROLA products, and in consideration for entering into a Representative Agreement, I make the following covenants understanding that MOTOROLA will rely on these covenants in connection with my Agreement:

1. I acknowledge that I understand the requirements of the Foreign Corrupt Practices Act ("FCPA") and MOTOROLA'S Code of Conduct as they relate to my representation or distribution of MOTOROLA products. I will attend local or regional FCPA briefings as requested by MOTOROLA.

2. I will not, directly or indirectly, in connection with my Representative Agreement and business resulting there from offer, pay, promise to pay, or authorize the giving of money or anything of value (e.g. a promise of future employment, a retainer agreement) to any government official as defined in the FCPA (as amended), to any political party or official thereof or to any candidate for political office, or to any person, while knowing or being aware of a high probability that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any government official, to any political party or official thereof, or to any candidate for political office, for the purposes of:

   a) influencing any act or decision of such official, political party, party official, or candidate in his or its official capacity, including a decision to fail to perform his or its official functions; or

   b) inducing such official, political party, party official, or candidate to use his or its influence with the government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, to assist MOTOROLA in obtaining or retaining business for or with, or directing business to MOTOROLA. I understand that this payment prohibition is not limited to payments made from commission proceeds.

3. No partner, owner, principal or staff member of my organization are officials, officers or representatives of any government or political party or candidate for political office.

4. None of my compensation will be used for any purpose, nor will I take any action, which would constitute a violation of any law of the various jurisdictions in which I perform services or of the United States, including the FCPA. I will not seek to obtain or to provide to anyone documents or other information the disclosure of which is prohibited by the law of any jurisdiction in which I perform services, including any information regarding competitor's bids or proposals regardless whether the disclosure of such information is so prohibited.

5. My representation of MOTOROLA is permitted under local law, and I have complied with all local government registration, approval and disclosure requirements. I will make my financial records

available to MOTOROLA and law enforcement authorities in case of alleged violation of the FCPA. I understand that the payment of all commissions will be made by wire transfer to my bank account in the country in which I am performing services.

6. I agree that I will obtain advance agreement in writing from MOTOROLA before incurring travel and entertainment expenses for, or providing gifts to, public officials or employees of any Government customer or potential Government customer involved in the purchase of MOTOROLA products. I understand that MOTOROLA will not approve any expenditure that would violate U.S. or local law and will approve only those entertainment expenditures that are considered reasonable.

7. I agree to indemnify MOTOROLA for all fines, fees and costs related to actual or alleged violation of any applicable law, including the FCPA, and I further agree that my Representative Agreement will be void ab initio upon discovery of any violation, whether or not investigated or prosecuted by the U.S. Government.

8. The services described in my Representative Agreement are services which I have the capacity to perform and are the only services for which I am being compensated. I understand that any invoice that I submit describing services performed is a certification that the services in question have actually been performed and are the only services giving rise to the invoice. The submission of a false or inaccurate invoice will be grounds for immediate termination of the Agreement.

9. I agree to provide MOTOROLA written updates to the information form that I completed in order for MOTOROLA to perform its FCPA due diligence review. I will provide such updates whenever there is a material change in the information previously provided, but in no event less frequently than annually (beginning January 30 of _2004_) and no later than January 30 of each succeeding year in which I am under contract with MOTOROLA.


Authorized Signature
REPRESENTATIVE

# Exhibit 4

## Performance Standards

### A) Customer Opportunity Requirements

The leading indicator of new business is new design wins. Expectations for both new revenue and design wins are set forward in this Exhibit.

### Definitions:

**Uncommitted Account/Program** (Level 1): An identified Account/Program that has been funded by the customer with assigned personnel working design requirements and possible solutions where MCG has an opportunity to be a supplier of products and/or services.

**Committed Account/Program** (Level 2): An Uncommitted Account/Program that has become a program where customer has actually purchased MCG product for development specific to the program.

**Design Win** (Level 3): A Committed Account/Program is classified as a Design Win when:

    a) A new customer buys MCG product, OR

    b) An existing MCG customer buys a different product for a new or redesigned program.

To qualify as a design win a project or account must have the intent to transition the development products into run rate business (in other words released to production). For the purposes of measuring and tracking design win performance it must meet the Design Win Revenue Baseline. The revenue baseline is the customer's expectation (forecast) of market demand for the product once it is in full production. Once a customer has purchased $25K in board level product or $50K in systems level product this is called a design win.

**Design Win Revenue Baseline:**

    a) Military/Aerospace Opportunities - $100K Annual; and

    b) Other - $250K Annual.

**New Revenue:** New revenue is revenue generated from new committed business and design wins.

|  | Q1 | Q2 | Q3 | Q4 | Q5 | Comments |
|---|---|---|---|---|---|---|
| Uncommitted – cumulative | 2 | 5 | 11 | 17 | 25 | Uncommitted opptys are cumulative - |
| Per Qtr | 2 | 3 | 6 | 6 | 8 | some move to committed |
| Committed – cumulative |  | 1 | 3 | 5 | 8 | New committed opptys |
| Per Qtr |  | 1 | 2 | 2 | 3 |  |
| Design Wins – cumulative |  |  | 1 | 2 | 3 | New committed opptys that meet |
| Per Qtr |  |  | 1 | 1 | 1 | Design Win criteria |
| Total New Rev – cumulative |  | $50 | $100 | $250 | $500 |  |
| Per Qtr |  | $50 | $50 | $150 | $250 |  |

## B) Territorial Development Requirement

A. In conjunction with MCG, participate/promote a minimum of four public seminars per year.

B. In conjunction with Motorola and/or its distributors, participate in a minimum of one territory specific sales promotion per year.

C. Support Motorola's efforts at shows with promotion and personnel attendance.

D. Submit monthly account update reports on lead follow up, account calls and other pertinent activity.

E. Insure all sales personnel receive a minimum of 24 hours of training on MCG products and services. This may include recorded webinars and/or live training presented by Motorola.

F. RTT agrees to hire, at a minimum, one new sales representative by June 30, 2003. If this deadline is not met, Motorola Computer Group retains the right under the terms of this agreement to reduce the expected commission paid.

G. RTT agrees to hire, at minimum, a second new sales representative by March 30, 2004. If this deadline is not met, Motorola Computer Group retains the right under the terms of this agreement to reduce the expected commission paid.

## C) Territory Revenue

Manufacturer's Representative agrees to interface and support MCG customers in their territory. The MR is expected to maximize the revenue achievement within their defined territory. The territory is defined in Exhibit 2 and the revenue quota for the period of 1 year from contract date is $1,700,000.

# EXHIBIT D

 **MOTOROLA**

February 26, 2004

VIA OVERNIGHT DELIVERY

RT Technologies Inc.
380 Foothill Road
Bridgewater, NJ 08807

Attn: Mr. Joe Palermino

Dear Mr. Palermino:

Motorola Computer Group ("Motorola") entered into a Manufacturer Representative Agreement (the "Agreement") with RT Technologies, Inc. ("RTT"), a Division of DSPCon, Inc., effective May 15, 2003. The Agreement expires May 14, 2004. It is Motorola's intent to terminate that Agreement.

The Agreement provides that Motorola may terminate the Agreement if RTT "should attempt to sell, assign, delegate, or transfer any of its rights and obligations under this Agreement without having obtained Motorola's prior written consent thereto, or if there should occur any material change in the management, ownership, control, sales personnel . . . or financial condition of" RTT. (Agreement ¶ 7.2(C)). RTT's ownership structure changed, and rights and obligations under this Agreement were either transferred or attempted to be transferred, in violation of the Agreement.

In addition, RTT agreed to maintain minimum performance standards, which were set out in Exhibit 4 to the Agreement. (Agreement ¶ 4.4). The parties also agreed that, if RTT "fails to meet such minimum performance standards, Motorola may terminate this Agreement for cause in accordance with Paragraph 7.2A." (*Id.*)

RTT has failed to meet the minimum standards required by the Agreement. Accordingly, Motorola is giving notice in accordance with paragraph 7.2A of that Agreement that the Agreement will be effectively terminated 30 days from the date of this letter, as a result of the improper attempted assignment and change of ownership as well as for failure to meet the performance standards.

To the extent RTT attempts to and is able to fully cure its noncompliance with the Agreement's terms and conditions, please be advised that nothing in this letter is intended to indicate an intent by Motorola to continue its contractual relationship beyond May 14, 2004, and, in fact, Motorola does not desire to do so.

Motorola wishes RTT the best of luck in the future. Should RTT have any questions about this letter, please call Steve Machernis.

Sincerely,

*Motorola, Inc.,* Motorola Computer Group
2900 South Diablo Way, Tempe, AZ 85282 U.S.A. Tel: +1 602 438 6733

 **MOTOROLA**

Dana Huth
Vice President, Motorola Computer Group, Inc
Worldwide Sales & Market Development

cc:  Al Brower

***Motorola, Inc.,*** Motorola Computer Group
2900 South Diablo Way, Tempe, AZ  85282 U.S.A. Tel: +1 602 438 5733

# EXHIBIT E

# MANUFACTURER'S REPRESENTATIVE AGREEMENT

between

## MOTOROLA COMPUTER GROUP

and

## G. L. WILLIAMS ASSOCIATES, INC.

# TABLE OF CONTENTS

Article I. Definitions....................................................................................................3

Article II. Appointment and Scope...............................................................................3

Article III. Representative's Compensation ....................................................................4

Article IV. Representative Obligations...........................................................................7

Article V. Motorola Obligations ..................................................................................9

Article VI Confidentiality and Proprietary Rights...........................................................10

Article VII. Term and Termination ..............................................................................11

Article VIII. Dispute Resolution ..................................................................................12

Article IX. General Provisions.....................................................................................13

## LIST OF EXHIBITS

- **EXHIBIT 1: REPRESENTATIVE PRODUCT LIST/COMMISION RATES**
- **EXHIBIT 2: TERRITORY, HOUSE ACCOUNT, AND LEGACY PROJECT LISTS**
- **EXHIBIT 3: FOREIGN CORRUPT PRACTICES ACT CERTIFICATION**
- **EXHIBIT 4: PERFORMANCE STANDARDS**

THIS AGREEMENT is made and effective on 01 July 2003 or the date of the last signature below, which ever is later, by and between Motorola Inc., a Delaware corporation, by and through its Computer Group having an office at 2900 South Diablo Way, Tempe Arizona, United States of America ("Motorola"), and G. L. Williams Associates, Inc. a Corporation organized under the laws of New Jersey, and having an office address of 805 Hopkins Road, Haddonfield, NJ 08033-3094 ("Representative").

## Article I. Definitions

1.1    **Agreement.** "Agreement" means this document and any exhibit, attachment, schedule, addendum, or modification unless the context otherwise indicates.

1.2    **Customer.** "Customer(s)" means any purchaser of Products from Motorola for end use in the Territory.

1.3    **Products.** "Products" means those Motorola products and systems that are specifically identified at Exhibit 1.

1.4    **Confidential Information.** "Confidential Information" means all information which is disclosed in oral, written, graphic, machine recognizable, and/or sample form, and which is clearly designated, labeled or marked as confidential or its equivalent and includes all know-how, designs, drawings, specifications, catalogs, data sheets, sales and technical bulletins, service manuals, mechanical diagrams, and all other information relating to the design, manufacture, use, and service of the Products, including any other information relating to Motorola's business that may be sent to Representative during performance of this Agreement and that is not generally known in the trade.

1.5    **Territory.** "Territory" is limited to the area or specified accounts identified in Exhibit 2.

## Article II. Appointment and Scope

2.1    **Appointment.** Subject to the terms, conditions and duration of this Agreement, Motorola appoints Representative as a non-exclusive, independent manufacturer's representative of the Products for end use in the Territory at such prices and upon such terms and conditions as established by Motorola. Representative accepts this appointment and agrees to devote such time and attention to the performance of such duties as may be reasonably necessary. Representative shall not, without Motorola's written authorization, register as Motorola's representative in any country or jurisdiction other than Territory.

2.2    **Territory Exclusivity.** This appointment is non-exclusive. While it is not currently Motorola's intent, Motorola retains the right to appoint additional sales representatives, agents, distributors or other representative for Products in or for the Territory. Motorola may also at any time sell any Products directly, as identified in Exhibit 1 or by written notice as provided for in paragraph 3.1, or indirectly through any Motorola subsidiary or affiliate without incurring any commission or other payment obligation to Representative of any type or nature. Motorola specifically reserves the House Accounts and Legacy Projects listed in Exhibit 2 as Motorola direct accounts for which Representative will not be entitled to receive any commission, including cases where a House Account or Legacy Project places an order through Motorola's distributors.

2.3    **Distribution Outside Territory.** Representative will limit its Product sales activities to Customers within the Territory and will not market Products outside the Territory.

2.4    **Agents and Subrepresentatives.** Representative may not appoint any agent, subrepresentative, or other person ("Sub-Agent") to promote Product sales or to otherwise perform any of Representative's obligations without Motorola's prior written approval and compliance with Motorola's policy for obtaining such approval. Motorola's approval of any such Sub-Agent shall be based upon Motorola's review of information provided by Representative. Any such approval shall not be deemed to create any obligation between Motorola and Sub-Agent. Actions of Sub-Agents shall be the sole responsibility of Representative and Representative agrees to indemnify and hold Motorola harmless against any and all acts, whether unintentional or deliberate, on the part of the Sub-Agent. Prior to furnishing any Product to a Sub-Agent, Representative shall obtain a signed agreement from such Sub-Agent consistent with the terms of this Agreement and shall, among other things, require that the Sub-Agent comply with the United States Foreign Corrupt Practices Act and Motorola's Code of Business Conduct. Sub-Agents will in no event be allowed to describe themselves or advertise themselves as Motorola authorized representatives or distributors.

2.5    **Independent Contractor Status.** Representative is an independent contractor who will not be considered a Motorola employee, agent or legal representative for any purpose; neither Representative nor any of its directors, officers, employees or agents will be, or will be considered, a Motorola agent or employee. Representative is not granted and will not exercise any right or authority to assume or create any obligation or responsibility on behalf of, or in the name of, Motorola. Specifically, Representative does not have authority, on Motorola's behalf, to: a) contract or make commitments; b) change prices or terms and conditions of sales; c) make warranties, oral or written, express or implied concerning Products; or d) take any action which would result in Motorola's liability for state, federal, or local taxes or any expenses of any kind.

2.6    **Operations and Expenses.** Representative's detailed operations under this Agreement are subject to the sole control and management of Representative. Except for training as may be provided by Motorola under Section 5.5, Representative is responsible for all its own expenses and employees and for providing, at its own expense, such office space, facilities, and training as may be required to carry out its obligations under this Agreement. Representative will incur no expense chargeable to Motorola, except as specifically authorized in advance in writing by Motorola. Any such chargeable expense shall be documented in accordance and consistent with applicable Motorola policies.

2.7    **Noncompetition.** Representative will not sell, offer for sale, or act as sales agent for the solicitation of orders for any products that are competitive with any of the Products as defined by Motorola; nor will Representative engage in any activity that may result in a relationship with current or future customers that creates a conflict of interest as defined by Motorola.

# Article III. Representative's Compensation

3.1    **Commissions.** For services detailed in this Agreement, commissions will based upon the Net Sales Price of Product for those orders to Motorola from either Motorola's distributors or those direct Customers that are in the Territory, other than Motorola House Accounts and Legacy Projects. Eligible orders shall be limited to those received by Motorola after the effective date of this Agreement and registered through the Motorola registration system, whether registered by Motorola's distributor for indirect orders or new orders registered by Representative, through its Motorola contact, for direct orders. Net Sales Price is defined as the:

(1) actual price (i.e., original contract price adjusted by change orders and termination orders) paid to Motorola by Customers for direct orders less any discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any; or

(2) Motorola list price less the then current Motorola distributor discount for indirect orders less any additional discounts, refunds, liquidated damages, sales or other applicable taxes, C.O.D. charges, insurance, commissions and finance charges, freight or transportation costs, or other allowances from the delivery point, if any.

The commission rate is identified for each Product in Exhibit 1. This agreed to commission rate is subject to subsequent reduction should business circumstances dictate or as may be restricted by law, regulation or contract with the Customer.

Motorola may make adjustments to authorized Territory and direct accounts upon written notice to Representative. In such cases of adjusted Territory and/or direct accounts, Representative will be eligible for a commission, pursuant to the commission schedule included in Exhibit 1, on all orders accepted and shipped within a period of 120 days following the date of adjustment for orders effected by those Territory and direct accounts changes.

3.2    **Net Sales Price Changes**. If: (a) the Net Sales Price changes after acceptance of the order by Motorola; or (b) credit is granted or a refund is made to a Customer for returned Products, and such change, credit or refund results in a different commission from the commission derived from Paragraph 3.1 above, any over or underpayment will be: (i) subtracted from or added to the next commission payment payable to Representative; or (ii) refunded by or paid to Representative within 30 days of written notice by Motorola if no further commissions are to become due.

3.3    **Billing Documents**. Any and all billing documentation which Motorola may provide to its Customers will be in accordance with Motorola's standard invoicing techniques reflecting the actual terms and conditions (prices, terms, commissions, etc.) of the sales transaction. Under no circumstances will a Customer be invoiced at other than the actual sales price.

3.4.    **Payments**. Commissions are earned on orders when payments of the invoices have been received from Customers, or on behalf of Customers, whether such payments are in whole or in part and shall be payable in accordance with Motorola standard policy of payment to third party representatives. Where payment is less than the full amount due on an invoice, the commission earned will be limited to the applicable commission rate multiplied by the amount actually received. Commissions earned may be subject to delay based upon milestone payments to Motorola, payment holdbacks and performance bond requirements and which delay shall be agreed to in writing by the parties prior to final customer contract award. Commissions earned will accumulate monthly and be due and payable on the end of the month following the month in which Customer payments have been received Commissions will be made payable to Representative and transmitted by mail to Representative's business address or such other means as are permissible under the laws of the Territory and the United States of America and in accordance with the internal policies of Motorola. Representative represents and warrants that it will report and disclose all commissions, fees or other types of compensation received under this Agreement as required under law.

3.5   **Refusal to Accept Orders.** Representative's entitlement to a commission depends on Motorola's acceptance of Customer orders during the term of this Agreement and Representative's efforts to secure such orders.   Motorola's failure or refusal to accept any order for any reason shall not create an obligation to pay either a commission or any damages in lieu thereof, nor shall any delay or default in the performance of any accepted order create an obligation to pay a commission or any claimed damages. Motorola shall not be obligated to make any commission payments for any orders received or accepted before the effective date of this Agreement, for sales from one government to another government, or for any order which is not, in Motorola's opinion, the result of Representative's efforts consistent with the terms and conditions of this Agreement.

3.6   **Commission Changes.** Commission levels may be amended by Motorola from time to time on all future business opportunities and will be effective 180 Days after written notice to Representative. _____

3.7   **Commission Restrictions.** MOTOROLA WILL NOT PAY A COMMISSION WHERE PROHIBITED OR TO THE EXTENT LIMITED BY UNITED STATES OR LOCAL LAW OR REGULATION, OR BY ANY CONTRACTUAL, FINANCING, OR OTHER SIMILAR PROVISION. REPRESENTATIVE ASSUMES THE RISK THAT A COMMISSION MIGHT BE SUBJECT TO A PROHIBITION OR LIMIT AND THAT REPRESENTATIVE WILL NOT BE PAID AS A RESULT. REPRESENTATIVE IS ENCOURAGED TO REVIEW LOCAL LAW, LOCAL REGULATIONS, POTENTIAL CONTRACTS, AND FINANCING ARRANGEMENTS FOR PROHIBITIONS OR LIMITATIONS ON COMMISSIONS. IF PAYMENT OF A COMMISSION IS LIMITED, BUT NOT ENTIRELY PROHIBITED, BY APPLICABLE UNITED STATES OR LOCAL LAW OR REGULATION, CONTRACT OR FINANCING ARRANGEMENTS, MOTOROLA AND REPRESENTATIVE MAY NEGOTIATE PAYMENT OF COMMISSION ON A CASE-BY-CASE BASIS WITHOUT OBLIGATING MOTOROLA TO PAY A COMMISSION IN EXCESS OF SUCH LIMITATIONS EXCEPT TO THE EXTENT IT AGREES IN ADVANCE AND IN WRITING.

Commissions on the sale of products pursuant to Foreign Military Sales/Foreign Military Financing (FMS/FMF), NATO and other sales where commissions may be otherwise restricted shall be payable in accordance with the relevant local law and United States law and regulations as follows:

1) Where there is no restriction on commissions, a commission will be paid at the agreed to rate as defined in Paragraph 3.1.

2) Where commissions are restricted, Motorola will pay a commission at the agreed to rate, not to exceed the amount restricted by law or regulation, or as otherwise specifically stipulated to by the Customer in writing prior to contract award.

3) Where a commission is prohibited, Motorola will pay no commission.

3.8   **Limitation of Liability.** IN NO EVENT, WHETHER FOR BREACH OF CONTRACT, WARRANTY, MOTOROLA'S NEGLIGENCE, STRICT LIABILITY IN TORT OR OTHERWISE WILL MOTOROLA BE LIABLE FOR INCIDENTAL, SPECIAL, PUNITIVE OR CONSEQUENTIAL DAMAGES INCLUDING, BUT NOT LIMITED TO, FRUSTRATION OF ECONOMIC OR BUSINESS EXPECTATIONS, LOSS OF PROFITS, LOSS OF DATA, COST OF CAPITAL, COST OF SUBSTITUTION OF PRODUCTS,

FACILITIES OR SERVICES, DOWNTIME, COSTS, OR ANY SIMILAR CLAIM OF A SPECIAL, INCIDENTAL, CONSEQUENTIAL OR PUNITIVE NATURE WHATSOEVER TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW.

3.9    **Claims Procedures.** Any dispute or claim against Motorola related to this Agreement, or its expiration or termination, requires written notice to Motorola within one hundred eighty (180) days of the event giving rise to the claim. Failure to give such notice will constitute a waiver of any claim against Motorola and will relieve Motorola from any and all liability on any such claim.

3.10    **Offsets.** Any credits, allowances, or other amounts payable or creditable to Representative by Motorola will be subject to offset for any claims or other amounts owed by Representative to Motorola pursuant to the provisions of this Agreement or otherwise.

3.11    **Taxes.** All taxes (including, but not limited to, income, withholding, sales, use, registration, ad valorem, excise, employment and documentary taxes), duties, excises or other such charges imposed by governmental or quasi-governmental bodies relating to the sale, shipment, acquisition, holding and disposition of Products by Representative or Representative's actions or presence in the Territory or any performance under this Agreement that are not the responsibility of the Customer will be paid by Representative, which agrees to indemnify and hold harmless Motorola or any Motorola Affiliate with respect to any such charges paid by Motorola or any Motorola Affiliate.

## Article IV. Representative Obligations

4.1    **Sales Promotion.** Representative will use best efforts to promote the sale and use of Products in Territory. Representative will immediately submit to its contact within Motorola all leads, forecasts, purchase orders, and other communications Representative develops or receives from a Customer or prospective Customer for the Products.

Representative must register all sales efforts and leads through the Motorola registration system for those opportunities that may result in direct orders to Motorola and will be eligible for a commission on only those direct orders so registered. Motorola will direct Representative as to the method of adequate registration.

4.2    **Facilities and Personnel.** Representative will maintain, at its own expense, such office space and facilities, and hire and train such personnel, as may be required to carry out its obligations under this Agreement.

4.3    **Promotional Materials.** Representative will maintain an adequate inventory of Motorola's current sales material and samples for use in an efficient and effective manner to promote the sale of Products in the Territory. At Motorola's request, Representative will not use any non-Motorola advertising or promotional materials to promote the Products without Motorola's prior written approval.

4.4    **Performance Standards.** Representative agrees to maintain minimum performance standards as provided in Exhibit 4, which standards may be amended from time to time by written consent of both parties. If Representative fails to meet such minimum performance standards, Motorola may terminate this Agreement for cause in accordance with Paragraph 7.2A.

**4.5    Sales Policies.** Representative will comply, and will cause its employees and agents to comply, with all Motorola sales policies and the Motorola Code of Ethics and Business Conduct and the United States Foreign Corrupt Practices Act.

**4.6    Service and Training.** Representative will assist Motorola in arranging for warranty, maintenance, and repair service for all Customers. Representative will ensure that appropriate personnel attend any local or regional training as Motorola reasonably requires.

**4.7    Local Law.** Representative will notify Motorola of the existence and content of any mandatory provision of law in the Territory or any other applicable law that conflicts with or otherwise affects any provision of this Agreement at the time of its execution or thereafter. Representative agrees to comply with all laws and regulations of the Territory. Failure to comply with this Paragraph 4.7 will be considered a material breach of this Agreement, allowing Motorola to terminate this Agreement effective immediately upon notice to Representative under Paragraph 7. 2E hereof.

**4.8    Questionable Payments.** Representative and Motorola shall use only ethical and legitimate business practices in the activities contemplated by this Agreement. Neither party shall engage in any improper gifts or payments in connection with the marketing or sale of any Product under this Agreement nor engage in any other improper, illegal or unethical conduct. In addition, Representative agrees to cooperate fully with Motorola in any investigation of such matters. As used in this paragraph, the term unethical conduct shall include improper, illegal or unethical conduct and corrupt payments within the meaning of the Motorola Code of Business Conduct, the United States Foreign Corrupt Practices Act (15 United States Code Section 78dd-1 and -2) and local anti-corruption laws. Representative certifies that neither it, nor any of its directors, officers, employees, or agents is an official, agent, or employee of any government or governmental agency or political party or a candidate for any political office as of the effective date of this Agreement. Representative represents and warrants that all information provided to Motorola during the process of qualification of Representative, is true, accurate and correct and that Representative will promptly notify Motorola of any change to that information or of any event that would or may result in an exception to the representations contained in this Agreement. Representative will require each of its directors, officers, employees, and agents to comply with the provisions of this Paragraph 4.8, and it will ensure that appropriate personnel attend any regional Motorola briefings on this topic. Motorola will make available to Representative the Motorola Code of Business Conduct and any other information requested under this Paragraph 4.8. Notwithstanding any provision of this Agreement, any breach of the provisions of this Paragraph 4.8 will be considered a material breach of this Agreement and entitle Motorola to terminate this Agreement effective immediately on notice to Representative under Paragraph 7.2E and may result in Representative's surrender of any claim for payment under this Agreement and the refund any payment received. Representative shall certify to the representations and warranties contained in this Paragraph 4.8 by reading and executing Exhibit 3 prior to the execution of this Agreement.

**4.9    Indemnification.** Representative agrees to indemnify, defend and save Motorola harmless from and against all claims, proceedings, losses, penalties, damages or actions, and all expenses incidental to any investigation, negotiation or defense thereof, based upon, arising out of, or in connection with: a) damage or injury (including death) to persons, property, reputation, or business opportunity, caused by or sustained in connection with the performance of services

hereunder or by conditions created hereby, except for damage or injury resulting solely and directly from Motorola's negligence or willful misconduct; b) breach of any of the provisions of this Agreement; c) negligence or other tortious conduct; d) representations or statements not specifically authorized by Motorola in this Agreement or in writing; e) violation by Representative (or any of its directors, officers, employees or agents) of any applicable law, regulation, or order in the Territory or of the United States; or f) any material misrepresentation or omission made by Representative in connection with the information supplied relative to paragraph 4.12.

Motorola will indemnify and hold Representative, its officers, directors, employees, successors, and assigns harmless against all claims and losses, that may be sustained as a result of: a) breach of any of the material provisions of this Agreement; b) disputes between Motorola and its customers to the extent that such dispute is due solely to Motorola's negligence or non-performance; or c) any material misrepresentation or omission made by Motorola in connection with the Products.

4.10    **Insurance.**  Both parties agree to maintain adequate financial resources or insurance to fulfill their financial responsibilities under this Agreement.

4.11    **Security.**  If, during this Agreement, Representative is involved in negotiations with sovereign governments or agencies for sale or use of Motorola Products by such governments or agencies requiring security clearance of Representative's personnel, Representative agrees to cooperate fully, to undertake at Representative's expense to acquire the necessary security clearance as requested by the governments or agencies and to observe all regulations or instructions issued by such governments or agencies with respect to such security clearance and maintenance of security.

4.12    **Due Diligence Review.**  Representative, prior to initial appointment as a representative hereunder and any subsequent renewals, shall provide information to Motorola in order for Motorola to perform a due diligence review to assess Representative's ability to perform its obligations under this Agreement. Representative represents and warrants and will, at the time of submission, certify that all information supplied in accordance with Motorola's request is complete and accurate and that Representative will immediately notify Motorola of any and all changes to that information.

# Article V. Motorola Obligations

5.1    **Sales Support.**  Motorola will provide Representative English language sales and marketing information for Products and furnish at reasonable cost such catalogs, specifications, promotional literature, and other materials pertaining to Products as are available.

5.2    **Advertising Programs.**  Motorola may advertise in the Territory, with or without consultation with Representative.

5.3    **Notification of Changes.**  Motorola will advise Representative, either in writing or by electronic means, of any changes in or affecting the Products or prices, terms and conditions of sale, sales policies, projected delivery dates, schedule changes, and other matters that Motorola determines may affect the business of Representative.

5.4    **Assistance**. Motorola will provide Representative reasonable access to and assistance of its technical, sales, and service personnel as Motorola deems appropriate. Such assistance will be without charge to Representative except as otherwise mutually agreed.

5.5    **Training**. Motorola will conduct, and Representative will cause its personnel to attend, such technical and sales training sessions for Products as Motorola deems necessary to allow Representative to effectively market the Products. Such training will be provided without charge to Representative. All compensation, transportation, or living expenses of Representative's personnel while in attendance at such training sessions will be borne by Representative.

## Article VI Confidentiality and Proprietary Rights

6.1    **Confidential Information**. Both parties acknowledge that Confidential Information is valuable and proprietary. The receiving party will hold Confidential Information in strict confidence for five (5) years after expiration or termination of this Agreement and will not disclose it to any other person, firm, or corporation without the disclosing party's prior written approval. This obligation will not extend to information which is now available or becomes available to the public without breach of this Agreement, is released in writing by disclosing party, is lawfully obtained from a third party or parties without confidential obligation, is known to the receiving party prior to such disclosure or is at any time developed by the receiving party independently of any such disclosure or disclosures from the disclosing party.

6.2    **Use of Confidential Information**. The receiving party will limit its use of Confidential Information and any patent, trademark, or other intellectual property rights of the other party to implementation of this Agreement. Representative shall place the following legend on all Motorola Confidential Information disclosed by Representative to its government customers:

> "The information contained in this document is submitted in confidence, is privileged and exempt from disclosure under the "Freedom of Information Act" (5 U.S.C. Section 552) by reason of exemptions in Sections (b)(3) by reference to 18 U.S.C. Section 1905 - and (b)(4) of said act."

Both parties acknowledge that damages sustained as a consequence of any breach of the other party's obligations under this Paragraph 6.2 may be difficult to measure in monetary terms. Both parties hereby agree that as such the disclosing party shall be entitled seek: a) to have the continuation of any such breach immediately and permanently enjoined; and b) an award of exemplary damages in an appropriate amount determined by a court of competent jurisdiction in the State of Arizona.

6.3    **Trademarks and Trade Names**. Products may bear Motorola's trademarks, which Representative will not remove or efface. Representative shall have no right under this Agreement to use the tradenames, trademarks, or logos of Motorola without Motorola's prior express written consent. All use of such trademarks will inure solely to Motorola's benefit. Representative will not directly or indirectly use any of Motorola's trademarks or part thereof, or any mark or name confusingly similar thereto, as part of its corporate or business name or in any other manner, except that: a) Representative may identify itself as an authorized Representative of Motorola in accordance with Motorola's written instructions; and b) upon Motorola's written consent, Representative may use Motorola's trademarks relating to the Products for display purposes in connection with solicitation of orders for Products. In addition, Representative will not register any of Motorola's trademarks or any mark or name closely resembling them.

6.4    **Protection of Proprietary Rights.** Representative will cooperate with and assist Motorola, at Motorola's expense, in the protection of trademarks, patents, or copyrights owned by or licensed to Motorola and will inform Motorola immediately of any infringements or other improper action with respect to such trademarks, patents, or copyrights that come to the attention of Representative.

## Article VII. Term and Termination

7.1    **Term.** Unless terminated as provided in Paragraph 7.2 below or by mutual written consent, this Agreement will continue in full force and effect for an initial term expiring one (1) year after the effective date hereof and thereafter may be renewed only upon the written Agreement of both parties.

7.2    **Termination.** This Agreement may be terminated before expiration of the initial or any renewal term, as provided in Paragraph 7.1 above, by prior written notice to the other party as follows:

A.    By either party, in the event the other party should fail to perform any of its obligations hereunder and should fail to remedy such nonperformance within thirty (30) calendar days after receiving written demand therefore or, if the nature of the default does not reasonably allow it to be remedied in thirty (30) days, the Agreement will be considered terminated if the defaulting party fails to take corrective action within thirty (30) days after receipt of a notice of default and intent to terminate from the nondefaulting party;

B.    By either party, effective immediately, if the other party should become the subject of any voluntary or involuntary bankruptcy, receivership, or other insolvency proceedings or make an assignment or other arrangement for the benefit of its creditors, or if such other party should be nationalized or have any of its material assets expropriated;

C.    By Motorola, effective immediately, if Representative should attempt to sell, assign, delegate, or transfer any of its rights and obligations under this Agreement without having obtained Motorola's prior written consent thereto, or if there should occur any material change in the management, ownership, control, sales personnel, sales and marketing capability, or financial condition of Representative;

D.    By Motorola, effective immediately, if any law or regulation should be adopted or in effect in the Territory that would restrict Motorola's termination rights or otherwise invalidate any provisions hereof;

E.    By Motorola, effective immediately, if Representative should violate the terms of Paragraph 2.7 above or otherwise in accordance with provisions of Paragraphs 4.5, 4.7 and 4.8;

F.    By Motorola, effective immediately, if Representative knowingly makes any false or untrue statements or representations to Motorola herein or in the performance of its obligations hereunder; and

G.    By either party, without cause after the initial 180 days following the effective date of this Agreement, on thirty (30) days prior written notice to the other party.

7.3    **Rights of Parties on Termination.** Upon termination or expiration of this Agreement:

A.   Representative will cease all sales and other activities on behalf of Motorola, return to Motorola and immediately cease all use of Confidential Information, turn over to Motorola Representative's current Customer mailing list and take such action as is necessary to terminate Representative's registration as Motorola's sales Representative with any government authority.

B.   All indebtedness of Representative to Motorola will become immediately due and payable without further notice or demand, which is hereby expressly waived. Both parties will be entitled to seek reimbursement for reasonable attorneys' fees that it may incur in collecting or enforcing payment of any such obligations under this Agreement.

C.   Representative will: a) remove from its property and immediately discontinue all use, directly or indirectly, of trademarks, designs, and markings owned or controlled, now or hereafter, by Motorola, or of any word, title, expression, trademark, design, or marking that, in the opinion of Motorola, is confusingly similar thereto; and b) further certify in writing that Representative has completely terminated its use of any and all such trademarks, designs, or markings, or any other word, title, or similar expression that appeared in or on any devices or other materials used in conjunction with Representative's business.

D.   Representative shall not be eligible for any commissions in the case of termination by Motorola as described in Paragraphs 7.2 A through F.  Representative will be only be eligible for further commissions in the case of termination by Motorola pursuant to Paragraph 7.2 G and only on:

1)   All direct open orders and new direct orders accepted and shipped within a period of 180 days as of the date of termination or expiration; and

2)   All net distribution POS orders and new distribution POS orders accepted and shipped within a period of 180 days as of the date of termination or expiration.

E.   The obligations of Representative under Paragraphs 4.9, 4.10, 4.11 and Article VI will survive the termination or nonrenewal of this Agreement for any reason.

7.4     **Sole Remedy**.  Motorola's payment obligations in this Article VII shall be Representative's sole remedy for the termination or nonrenewal of this Agreement and will be in lieu of all other claims that Representative may have against Motorola as a result thereof. Representative hereby waives its right to any termination compensation and damages it may have a right to under local law.  Motorola will not be liable to Representative by reason of termination or nonrenewal of this Agreement for compensation, reimbursement, or damages for:

A.   Loss of prospective compensation;

B.   Goodwill or loss thereof; or

C.   Expenditures, investments, leases, or any type of commitment made in connection with the business of such party or in reliance on the existence of this Agreement.

# Article VIII. Dispute Resolution

8.1     MOTOROLA and Representative agree to attempt to settle any claim or controversy arising out of this Agreement through consultation and negotiation in the spirit of mutual

friendship and cooperation. If such attempts fail, then the dispute may first be submitted to a mutually acceptable neutral advisor for initial fact finding in preparation for mediation or other form of alternate dispute resolution. The Court shall finally determine any dispute that cannot be so resolved between the parties in good faith under Arizona law.

## Article IX. General Provisions

9.1    **Entire Agreement.** This Agreement represents the entire agreement between the parties and supersedes all prior discussions, agreements, and understandings of every kind. No modification of this Agreement will be effective unless in writing and signed by both parties. Any and all side letters or supplementary agreements not specifically added to this agreement by amendment or addendum shall be of no effect whatsoever.

9.2    **Notices.** All notices under this Agreement will be in English and will be in writing and given by certified mail, overnight courier, or telefax (acknowledged by answerback) addressed to the parties at the addresses immediately below their respective signatures hereto, or to such other address of which either party may advise the other in writing. Notices will be deemed given when sent.

9.3    **Force Majeure.** Neither party will be in default hereunder by reason of any failure or delay in the performance of any obligation under this Agreement where such failure or delay arises out of any cause beyond the reasonable control and without the fault or negligence of such party. Such causes will include, without limitation, storms, floods, other acts of nature, fires, explosions, riots, war or civil disturbance, strikes or other labor unrest, embargoes and other governmental actions or regulations that would prohibit either party from ordering or furnishing Products or from performing any other aspects of the obligations hereunder, delays in transportation, and inability to obtain necessary labor, supplies, or manufacturing facilities.

9.4    **Severability.** Subject to the provisions of Paragraph 7.2D above, the illegality or unenforceability of any provision of this Agreement will not affect the validity and enforceability of any legal and enforceable provisions hereof.

9.5    **Nonassignment.** This Agreement will be binding on and inure to the benefit of the successors and assigns of the business interests of Motorola and may be assigned by Motorola only to the acquirer of substantially all of Motorola's assets in conjunction with such an acquisition. Representative will not sell, assign, delegate, or otherwise transfer any of its rights or obligations hereunder without the prior written consent of Motorola.

9.6    **Language.** The English language version of this Agreement will govern and control any translations of the Agreement into any other language.

9.7    **Applicable Law.** This Agreement will be construed, enforced, and performed in accordance with the internal laws of Arizona, U.S.A. without reference to principles of conflicts of laws and specifically excluding the UN Convention of the Sale of Goods with respect to any purchases hereunder. Use of Arizona law shall apply exclusively to this Agreement.

9.8 **Non-Solicitation.** During the term of this Agreement and for a period of eighteen (18) months following the expiration or termination of this Agreement, neither party or its successors and assigns will encourage or solicit any employee to leave the employ of the other without

written approval; the foregoing does not prohibit mass media advertising not specifically directed towards any particular employee of the other party.

9.9    **Waiver.** Motorola's failure to require Representative's performance of the provisions herein will not operate as a waiver of Motorola's right to request strict performance of the same or like provisions, or any other provisions hereof, at a later time.

9.10    **Headings.** Headings are for convenience of reference only and are not a part of this Agreement, nor will they in any way affect interpretation hereof.

**IN WITNESS WHEREOF,** Motorola and Representative have caused this Agreement to be executed by their duly authorized employees.

Representative:
**G. L. Williams Associates, Inc.**

_(signature)_
(Authorized Signature)

_Scott L. Williams_
(Typed Name)

_President_
(Title)

_5/29/03_
(Date)

**Motorola Inc., Motorola Computer Group**

_(signature)_
(Authorized Signature)

Wendy Vittori
(Typed Name)

Vice President and General Manager
(Title)

_6/3/03_
(Date)

**ADDRESS FOR FORMAL NOTICE:**

G. L. Williams Associates, Inc. _____

805 Hopkins Road

Haddonfield, NJ 08033-3094

Fax No. (856) 428-6930

ATTENTION: Scott L. Williams_____

**ADDRESS FOR FORMAL NOTICE:**

Motorola Computer Group

2900 S. Diablo Way, DW103

Tempe, AZ  85282 USA

Fax No. (602) 437-6246

ATTENTION: Group Contracts

# Exhibit 1

## REPRESENTATIVE PRODUCT LIST AND
## COMMISSION RATES

### PRODUCT LIST

All MCG Board and System Products

### COMMISSION RATES:

Commissions for the monthly distributor POS run rate business in the Territory shall be paid at a rate of Five percent (5%).

Commission for all new MCG direct business in which Representative is directly involved, as evidenced by registration of the opportunity by the Representative's MCG contact, shall be paid at a rate of Five percent (5%).

# Exhibit 2

## TERRITORY, HOUSE ACCOUNT, AND LEGACY PROJECT LISTS

**Territory:**

All POS Distribution accounts in the states of Delaware, New Jersey, Pennsylvania, and New York-Metro defined by zip codes 100xx-119xx not called out as Motorola House Accounts or Legacy Projects.

All direct accounts within the Territory not called out as Motorola House Accounts or Legacy Projects.

**Motorola House Accounts:**

Nortel Networks
Motorola
General Electric Medical Systems
Tellabs
Marconi
Eastman Kodak
Alcatel
Scitex
Telephonics

All MCG product purchases through Value Added Resellers, Contract Manufacturers and/or Distribution that are purchased for the above account sites are also included under Motorola House Accounts List whether currently in or moved to the above defined Territory.

**Motorola Legacy Projects:**

| Customer Name | Project Name | PID/RepID |
|---|---|---|
| Kulicke and Soffa | ATX-1 | ST3824202664 |
| Kulicke and Soffa | Maxim CI | SC2964196264 |
| Lockheed Martin | AEGIS (SCP2604-1441, SCP2604-1461, SCP2604-1471, & RAM200-047) | 29874 |
| Quintum | Tenor MultiPath VoIP Switch | SC1333191332 |
| Sechan Electronics Inc | Minute Man | 28670 |
| Sechan Electronics Inc | Sliver | 28669 |
| Telesciences Corporation | Sterling (MVME167) | 15988 |

# Exhibit 3

## FOREIGN CORRUPT PRACTICES ACT
## CERTIFICATION

While representing or distributing MOTOROLA products, and in consideration for entering into a Representative Agreement, I make the following covenants understanding that MOTOROLA will rely on these covenants in connection with my Agreement:

1. I acknowledge that I understand the requirements of the Foreign Corrupt Practices Act ("FCPA") and MOTOROLA'S Code of Conduct as they relate to my representation or distribution of MOTOROLA products. I will attend local or regional FCPA briefings as requested by MOTOROLA.

2. I will not, directly or indirectly, in connection with my Representative Agreement and business resulting there from offer, pay, promise to pay, or authorize the giving of money or anything of value (e.g. a promise of future employment, a retainer agreement) to any government official as defined in the FCPA (as amended), to any political party or official thereof or to any candidate for political office, or to any person, while knowing or being aware of a high probability that all or a portion of such money or thing of value will be offered, given or promised, directly or indirectly, to any government official, to any political party or official thereof, or to any candidate for political office, for the purposes of:

   a) influencing any act or decision of such official, political party, party official, or candidate in his or its official capacity, including a decision to fail to perform his or its official functions; or

   b) inducing such official, political party, party official, or candidate to use his or its influence with the government or instrumentality thereof to affect or influence any act or decision of such government or instrumentality, to assist MOTOROLA in obtaining or retaining business for or with, or directing business to MOTOROLA. I understand that this payment prohibition is not limited to payments made from commission proceeds.

3. No partner, owner, principal or staff member of my organization are officials, officers or representatives of any government or political party or candidate for political office.

4. None of my compensation will be used for any purpose, nor will I take any action, which would constitute a violation of any law of the various jurisdictions in which I perform services or of the United States, including the FCPA. I will not seek to obtain or to provide to anyone documents or other information the disclosure of which is prohibited by the law of any jurisdiction in which I perform services, including any information regarding competitor's bids or proposals regardless whether the disclosure of such information is so prohibited.

5. My representation of MOTOROLA is permitted under local law, and I have complied with all local government registration, approval and disclosure requirements. I will make my financial

records available to MOTOROLA and law enforcement authorities in case of alleged violation of the FCPA. I understand that the payment of all commissions will be made by wire transfer to my bank account in the country in which I am performing services.

6. I agree that I will obtain advance agreement in writing from MOTOROLA before incurring travel and entertainment expenses for, or providing gifts to, public officials or employees of any Government customer or potential Government customer involved in the purchase of MOTOROLA products. I understand that MOTOROLA will not approve any expenditure that would violate U.S. or local law and will approve only those entertainment expenditures that are considered reasonable.

7. I agree to indemnify MOTOROLA for all fines, fees and costs related to actual or alleged violation of any applicable law, including the FCPA, and I further agree that my Representative Agreement will be void ab initio upon discovery of any violation, whether or not investigated or prosecuted by the U.S. Government.

8. The services described in my Representative Agreement are services which I have the capacity to perform and are the only services for which I am being compensated. I understand that any invoice that I submit describing services performed is a certification that the services in question have actually been performed and are the only services giving rise to the invoice. The submission of a false or inaccurate invoice will be grounds for immediate termination of the Agreement.

9. I agree to provide MOTOROLA written updates to the information form that I completed in order for MOTOROLA to perform its FCPA due diligence review. I will provide such updates whenever there is a material change in the information previously provided, but in no event less frequently than annually (beginning January 30 of _2004_) and no later than January 30 of each succeeding year in which I am under contract with MOTOROLA.

_Scott K Williams_  5/29/03

Authorized Signature
REPRESENTATIVE

# Exhibit 4

## Performance Standards

## A) Customer Opportunity Requirements

The leading indicator of new business is new design wins.  Expectations for both new revenue and design wins are set forward in this Exhibit.

### Definitions:

**Uncommitted Account/Program** (Level 1):  An identified Account/Program that has been funded by the customer with assigned personnel working design requirements and possible solutions where MCG has an opportunity to be a supplier of products and/or services.

**Committed Account/Program** (Level 2):  An Uncommitted Account/Program that has become a program where customer has actually purchased MCG product for development specific to the program.

**Design Win** (Level 3): A Committed Account/Program is classified as a Design Win when:

a)  A new customer buys MCG product, OR

b)  An existing MCG customer buys a different product for a new or redesigned program.

To qualify as a design win, a project or account must have the intent to transition the development products into run rate business (in other words released to production).  For the purposes of measuring and tracking design win performance it must meet the Design Win Revenue Baseline.  The revenue baseline is the customer's expectation (forecast) of market demand for the product once it is in full production.  Once a customer has purchased $25K in board level product or $50K in systems level product this is called a design win.

**Design Win Revenue Baseline:**

a)  Military/Aerospace Opportunities - $100K Annual; and

b)  Other - $250K Annual.

**New Revenue:**  New revenue is revenue generated from new committed business and design wins.

| | Q1 | Q2 | Q3 | Q4 | Q5 | Comments |
|---|---|---|---|---|---|---|
| Uncommitted- cumulative | 3 | 6 | 12 | 18 | 26 | Uncommitted opptys are cumulative - |
| Per Qtr | 3 | 3 | 6 | 6 | 8 | some move to committed |
| Committed- cumulative | | 2 | 5 | 8 | 12 | New committed opptys |
| Per Qtr | | 2 | 3 | 3 | 4 | |
| Design Wins - cumulative | | | 2 | 4 | 7 | New committed opptys that meet |
| Per Qtr | | | 2 | 2 | 3 | Design Win criteria |
| Total New Rev - cumulative | | $50K | $250K | $500K | $750K | |
| Per Qtr – Other | | $50K | $200K | $250K | $250K | |
| Total New Rev - cumulative | | $25K | $75K | $150K | $250K | |
| Per Qtr – Mil/Aero | | $25K | $50K | $75K | $100K | |

## B) Territorial Development Requirement

A. In conjunction with MCG, participate/promote a minimum of four public seminars per year.

B. In conjunction with Motorola and/or its distributors, participate in a minimum of one territory specific sales promotion per year.

C. Support Motorola's efforts at shows with promotion and personnel attendance.

D. Submit monthly account update reports on lead follow up, account calls and other pertinent activity.

E. Insure all sales personnel receive a minimum of 24 hours of training on MCG products and services. This may include recorded webinars and/or live training presented by Motorola.

F. Coordinate monthly account review with Arrow, Avnet and ACT Technico.

G. Maintain a database that tracks revenue forecast for all active programs, new wins being pursued, actions required to close new design wins, and target opportunities. Database is to be updated on a monthly basis.

## C) Territory Revenue

Manufacturer's Representative agrees to interface and support MCG customers in their territory. The MR is expected to maximize the revenue achievement within their defined territory. The territory is defined in Exhibit 2 and the revenue quota for the period of 1 year from contract date is $2,385,586.

**JS 44** (Rev. 11/04)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

| I. (a)  PLAINTIFFS | DEFENDANTS |
|---|---|
| G.L. WILLIAMS ASSOCIATES, INC.; RT TECHNOLOGY, LLC and WEST COAST REPS, INC., | MOTOROLA, INC. |

| | |
|---|---|
| **(b)** County of Residence of First Listed Plaintiff   **Camden County** <br> (EXCEPT IN U.S. PLAINTIFF CASES) | County of Residence of First Listed Defendant _____ <br> (IN U.S. PLAINTIFF CASES ONLY) <br> NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE <br> LAND INVOLVED. |
| **(c)** Attorney's (Firm Name, Address, and Telephone Number) <br> Sean J. Bellew/David A. Felice, Cozen O'Connor, 1201 N. Market Street, Suite 1400, Wilmington, DE (302) 295-2000 | Attorneys (If Known) <br> William W. Bowser, Young Conaway Stargatt & Taylor LLP, 1000 West Street, 17th Floor, Wilmington, DE 19801 |

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

☐ 1  U.S. Government Plaintiff

☐ 3  Federal Question
(U.S. Government Not a Party)

☐ 2  U.S. Government Defendant

☒ 4  Diversity
(Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff and One Box for Defendant)
(For Diversity Cases Only)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance <br> ☐ 120 Marine <br> ☐ 130 Miller Act <br> ☐ 140 Negotiable Instrument <br> ☐ 150 Recovery of Overpayment & Enforcement of Judgment <br> ☐ 151 Medicare Act <br> ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) <br> ☐ 153 Recovery of Overpayment of Veteran's Benefits <br> ☐ 160 Stockholders' Suits <br> ☐ 190 Other Contract <br> ☐ 195 Contract Product Liability <br> ☐ 196 Franchise | **PERSONAL INJURY** <br> ☐ 310 Airplane <br> ☐ 315 Airplane Product Liability <br> ☐ 320 Assault, Libel & Slander <br> ☐ 330 Federal Employers' Liability <br> ☐ 340 Marine <br> ☐ 345 Marine Product Liability <br> ☐ 350 Motor Vehicle <br> ☐ 355 Motor Vehicle Product Liability <br> ☐ 360 Other Personal Injury | **PERSONAL INJURY** <br> ☐ 362 Personal Injury - Med. Malpractice <br> ☐ 365 Personal Injury - Product Liability <br> ☐ 368 Asbestos Personal Injury Product Liability <br> **PERSONAL PROPERTY** <br> ☐ 370 Other Fraud <br> ☐ 371 Truth in Lending <br> ☐ 380 Other Personal Property Damage <br> ☐ 385 Property Damage Product Liability | ☐ 610 Agriculture <br> ☐ 620 Other Food & Drug <br> ☐ 625 Drug Related Seizure of Property 21 USC 881 <br> ☐ 630 Liquor Laws <br> ☐ 640 R.R. & Truck <br> ☐ 650 Airline Regs. <br> ☐ 660 Occupational Safety/Health <br> ☐ 690 Other | ☐ 422 Appeal 28 USC 158 <br> ☐ 423 Withdrawal 28 USC 157 <br> **PROPERTY RIGHTS** <br> ☐ 820 Copyrights <br> ☐ 830 Patent <br> ☐ 840 Trademark | ☐ 400 State Reapportionment <br> ☐ 410 Antitrust <br> ☐ 430 Banks and Banking <br> ☐ 450 Commerce <br> ☐ 460 Deportation <br> ☐ 470 Racketeer Influenced and Corrupt Organizations <br> ☐ 480 Consumer Credit <br> ☐ 490 Cable/Sat TV <br> ☐ 810 Selective Service <br> ☐ 850 Securities/Commodities/ Exchange <br> ☐ 875 Customer Challenge 12 USC 3410 <br> ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** <br> ☐ 210 Land Condemnation <br> ☐ 220 Foreclosure <br> ☐ 230 Rent Lease & Ejectment <br> ☐ 240 Torts to Land <br> ☐ 245 Tort Product Liability <br> ☐ 290 All Other Real Property | **CIVIL RIGHTS** <br> ☐ 441 Voting <br> ☐ 442 Employment <br> ☐ 443 Housing/ Accommodations <br> ☐ 444 Welfare <br> ☐ 445 Amer. w/Disabilities - Employment <br> ☐ 446 Amer. w/Disabilities - Other <br> ☐ 440 Other Civil Rights | **PRISONER PETITIONS** <br> ☐ 510 Motions to Vacate Sentence <br> **Habeas Corpus:** <br> ☐ 530 General <br> ☐ 535 Death Penalty <br> ☐ 540 Mandamus & Other <br> ☐ 550 Civil Rights <br> ☐ 555 Prison Condition | **LABOR** <br> ☐ 710 Fair Labor Standards Act <br> ☐ 720 Labor/Mgmt. Relations <br> ☐ 730 Labor/Mgmt.Reporting & Disclosure Act <br> ☐ 740 Railway Labor Act <br> ☐ 790 Other Labor Litigation <br> ☐ 791 Empl. Ret. Inc. Security Act | **SOCIAL SECURITY** <br> ☐ 861 HIA (1395ff) <br> ☐ 862 Black Lung (923) <br> ☐ 863 DIWC/DIWW (405(g)) <br> ☐ 864 SSID Title XVI <br> ☐ 865 RSI (405(g)) <br> **FEDERAL TAX SUITS** <br> ☐ 870 Taxes (U.S. Plaintiff or Defendant) <br> ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 891 Agricultural Acts <br> ☐ 892 Economic Stabilization Act <br> ☐ 893 Environmental Matters <br> ☐ 894 Energy Allocation Act <br> ☐ 895 Freedom of Information Act <br> ☐ 900 Appeal of Fee Determination Under Equal Access to Justice <br> ☐ 950 Constitutionality of State Statutes |

## V. ORIGIN (Place an "X" in One Box Only)

☒ 1 Original Proceeding
☐ 2 Removed from State Court
☐ 3 Remanded from Appellate Court
☐ 4 Reinstated or Reopened
☐ 5 Transferred from another district (specify)
☐ 6 Multidistrict Litigation
☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity): 28 U.S.C. § 1332

Brief description of cause:  Breach of contract, promissory estoppel, negligent misrepresentation, breach of the covenant of good faith and fair dealing, fraud and deceptive trade practices.

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE  Judge Sue L. Robinson     DOCKET NUMBER  04-960-SLR

DATE  02/22/2006

SIGNATURE OF ATTORNEY OF RECORD  *David A. Felice (#4090)*

**FOR OFFICE USE ONLY**

RECEIPT # _____  AMOUNT _____  APPLYING IFP _____  JUDGE _____  MAG. JUDGE _____

AO FORM 85 RECEIPT (REV. 9/04)

United States District Court for the District of Delaware

Civil Action No. _____ 4 _____

# ACKNOWLEDGMENT
# OF RECEIPT FOR AO FORM 85

## *NOTICE OF AVAILABILITY OF A*
## *UNITED STATES MAGISTRATE JUDGE*
## *TO EXERCISE JURISDICTION*

I HEREBY ACKNOWLEDGE RECEIPT OF _____ COPIES OF AO FORM 85.

22 Feb 06
_____
(Date forms issued)

_____
(Signature of Party or their Representative)

Wynton Smith
_____
(Printed name of Party or their Representative)

Note: Completed receipt will be filed in the Civil Action